# EXHIBIT B

# Dennis Cokely, Ph.D.

# Expert Opinion Report

**September 9, 2012**

**Expert Qualifications:**

I am currently a tenured, full Professor and the Director of the American Sign Language Program and the Chair of the Department of Languages, Literatures and Cultures at Northeastern University. I have been involved with Deaf people on a personal and professional level for over forty years. I hold a doctorate in Sociolinguistics from Georgetown University and am a nationally certified Sign Language interpreter. I have authored or coauthored ten textbooks, five book chapters, thirty-three articles or conference proceedings, and have directed and/or edited over 250 videotapes focusing on American Sign Language and ASL/English Interpretation and I have also produced published translations of over 80 videotapes. The 1980 series of five texts that I co-authored is widely used in Sign Language programs and classes across the United States. My 1992 book, *A Sociolinguistic Model of the Interpretation Process,* has been translated into Italian and German. I am currently the Principal Investigator for a three million dollar grant from the Department of Education to establish a National Interpreter Education Center at Northeastern University.

Prior to coming to Northeastern I spent twelve years working full-time as the President and co-owner of Sign Media, Inc. a video-production company specializing in producing print and video material focused on the American Deaf Community, American Sign Language, and ASL/English Interpretation. Prior to that I spent thirteen years working at Gallaudet University in a number of capacities – a teacher of elementary, undergraduate and graduate students; an administrator responsible for teaching and evaluating faculty and staff, and as a Research Associate in the Linguistics Research Lab. See Exhibit A for my complete vita.

I have been retained by counsel for Larry Berke to work on this case at the rate of $100.00 per hour.  I have been provided with, have reviewed, and have used in developing my report the materials listed in Exhibit B.  In preparing this report I also interviewed Mr. Berke and his youngest daughter via VideoPhone on September 7, 2012.

In the last three years I have not been deposed but did testify on July 31, 2012 in *Bryant v. United States Bureau of Prisons.*

**Executive Summary**

Members of the American Deaf Community are a linguistic and cultural minority. The language that binds them together and is the critical determinant for membership in the Community is ASL. There are many stereotypic misconceptions about d/Deaf[1] people and ASL.[2] The people who are not d/Deaf often believe that d/Deaf people can lip-read with a degree of accuracy that will enable meaningful communication, when in reality the level of lip-reading accuracy for most Deaf people is 30% at best. Further, those who are not deaf generally believe that d/Deaf people can read and write English fluently when, in reality, the average Deaf person reads at approximately a fourth grade reading level. Lastly, those who are not deaf widely fail to understand that effective communication with d/Deaf people requires that one communicate visually using visual signals and alarms and requires the provision of sign language interpreters when needed.

While some Deaf people use TeleTypewriters ("TTYs") to communicate over telephone lines (which require messages to be typed in English), TTYs are increasingly being replaced by VideoPhones (which allow for ASL users to sign rather than type in English). Deaf people can communicate with each other using TTYs and VideoPhones and, using free federally funded relay services, they can also communicate with those who are not Deaf.

Mr. Larry Berke, coming from a multi-generational Deaf family is unquestionably a member of the American Deaf Community. He has deep and extensive ties to the Phoenix Deaf Community and to Deaf people nationwide. Based on my experience of over forty years, my review of written documentation my experience in the Bryant case and my interview with Mr. Berke on September 7, 2012, it is my opinion that there is a very high degree of probability that Mr. Berke will be denied effective communication and access to the services and technology that can make effective communication possible. I conclude that based on its past practices the BOP will very likely restrict

---

[1] The written distinction between "deaf" and "Deaf," lower and upper case, has been used since 1972 to differentiate between those who are deaf and those who are deaf but who also identify as a member of a linguistic and cultural minority. *See* Woodward, James C. 1972. "Implications for Sociolinguistic Research among the Deaf." *Sign Language Studies* 1:1-7.

[2] I recognize that not every hearing person holds these beliefs. However, in my experience these beliefs and stereotypes are held by the vast majority of hearing people, I have treated these beliefs and stereotypes as the norm and discuss them as such.

access to services, programs and communication in a way that denies meaningful and effective communicative access for Mr. Berke.[3]

## 1. Understanding *deafness*

The meaning of deafness is best understood "when it is viewed as a social phenomenon rather than as a physical disability. To say this is not to deny the usefulness of studying deafness medically but rather to point out that such an approach tends to overlook how their deafness influences deaf peoples' daily lives, how the disability of deafness becomes a handicap."[4]. Deafness is properly defined as "the common outcome of diverse causes resulting in an inability to hear and understand speech through the ear alone."[5] The critical import of this definition is that it emphasizes communication – a quintessential function of human beings. This definition specifies that people who are deaf cannot hear or have reduced hearing ability *and* cannot understand speech. Even if they can hear loud noises and are aware that someone is talking, they are still deaf by this definition if they cannot understand the speech they hear (*i.e.*, cannot discriminate sounds to comprehend what is said). This functional definition clearly and helpfully distinguishes the difference between those who are hard of hearing (those who have reduced hearing ability but can hear and understand speech) and those who are deaf (those who cannot hear or have reduced hearing ability *and* cannot understand speech).

The age at which one becomes deaf is critically important because this determines membership in one of two sub-sets within the larger class of deaf individuals. Childhood deafness creates significant obstacles to acquiring spoken language and becoming literate. It is generally associated with a tendency to seek out and socialize with other deaf people, thus becoming part of the American Deaf Community (see below). Adult onset deafness, on the other hand, generally does not interfere with speech and those who become deaf as adults generally do not seek out members of the American Deaf Community (*i.e.*, those early deafened) for companionship nor do members of the American Deaf Community seek out late-deafened adults for companionship. This is because although members of each sub-set are deaf (*i.e.*,

---

[3]       Should discovery yield additional information on past and present policies and practices at the BOP or on proposed changes by the BOP, I expect to examine that material and be afforded the opportunity to supplement the opinions offered in this report.

[4]       Schein, 1996 "The Demography of Deafness" in Higgins and Nash (eds.) *Understanding Deafness Socially*. Springfield, IL: Charles C. Thomas. pg. 22.

[5]       *Id.*

cannot hear *and* cannot understand speech) and although members of each sub-set rely upon visual not auditory means of communication, their life experiences have had different trajectories.

**Opinions with respect to defining deafness:**
> The meaning of deafness is best understood when viewed as a social and communicative phenomenon rather than simply as a physical disability.
> The class of people who are deaf cannot hear *and* cannot understand speech.
> Within the class of people who are deaf, there are two sub-sets: those who are deaf from childhood and those who become deafened later in life.
> Although each sub-set is deaf and relies upon visual communication, their life experiences have been very different.

## 2. The American Deaf Community

Individuals who are Deaf use ASL and are fundamentally a visual people, with their own visual language, social organizations, history, and mores (indeed, some have argued, rather convincingly, that Deaf people should be viewed as an ethnic minority[6]). They see themselves as members of the "Deaf-World." Although society in general may view their audiological condition as a defining element for Deaf people, what binds Deaf people together is their use of ASL. In short, these individuals, united by their use of ASL, are members of the American Deaf Community.

The use of ASL not only unites Deaf people, but it also defines them as a linguistic minority. The primary reason for the central role of ASL is that, unlike any other means of communication available to Deaf people, ASL is the only means of communication that enables effective, efficient and reliable communication among Deaf people. Its use provides a means of determining acceptance into the Community, enables social interaction among members of the community, and, through the use of ASL/English interpreters, provides a ready means of interacting with non-deaf people. The importance of ASL derives from the fact that it is a visually clear means of communication, one fully accessible to Deaf people, that enables them to have effective and efficient communication with each other and, by employing the services of an ASL/English interpreter, with the hearing and speaking majority.

Because of the essential nature of ASL in providing efficient and effective communication and in defining the American Deaf Community as a linguistic minority, it is important to address and dispel

---

[6] Lane, Pillard and Hedberg, 2011. *The People of the Eye: Deaf Ethnicity and Ancestry*. New York, NY. Oxford University Press. pg. xvii

several misconceptions about ASL as well as other commonly held misconceptions about d/Deaf people such as that "all deaf people can lip read" or that "all deaf people can speak" or that "all deaf people are fully literate in English."[7]

**Opinions with respect to the American Deaf Community:**
> Deaf people are unable to rely upon their hearing and speech as an effective and primary means of relating to the world and interacting with the hearing and speaking majority.
> Members of the American Deaf Community have their own visual language, ASL.
> Deaf people are a linguistic and cultural minority that is communicatively disadvantaged by the hearing and speaking majority.
> Use of ASL is central to determining membership in and defining the American Deaf Community.
> ASL is the only means of communication that enables effective, efficient and reliable communication for members of the American Deaf Community.

## 3. Deaf People as a Linguistic Community

### 3.1 American Sign Language

It is self-evident that the use of ASL not only unites American Deaf people as a linguistic community, but also separates them from those who use spoken English as their means of face-to-face communication. Simply put, the language used by Deaf people in America is signed, not spoken.

However, although there are different international signed languages, ASL, for a number of linguistic, social and political reasons, has become a signed *lingua franca* for Deaf people worldwide, not unlike the role occupied by spoken English among non-deaf people worldwide. A primary reason for this is that ASL is the signed language that has been most researched and documented by linguists. As such, those who use the language professionally, *e.g.*, ASL/English interpreters, are much more aware of the linguistic principles of ASL and how to use ASL to communicate clearly and effectively.

A misconception often held by those unfamiliar with ASL, is their mistaken belief that ASL is simply a manual form of, or a derivative of, spoken English. This is not so. The lexicon (*i.e.*, the vocabulary) of a signed language refers, not to the words of a spoken language, but rather directly to the

---

[7]      Cokely, Dennis. 2001; Spingarn, Tracie. 2001

concept or meaning that Deaf people wish to convey.[8] Thus, the ASL sign refers to an object (*e.g.*, a cat) and not to the English word for that object (just as the Japanese word "neko" refers, not to the English word "cat" but to the cat itself). In simplest terms, there is not a one-to-one correspondence between English words and the signs in ASL as is true of any two languages, spoken or signed.

ASL is a naturally evolved language used by members of the American Deaf Community and those non-Deaf people who have learned it. The language is transmitted generation to generation by "native signers" – those whose parents were themselves Deaf and who, from birth, acquired ASL as their first language. Linguists have historically sought out and valued native signers in order to conduct acquisition studies and to better analyze the language. Particularly valued are those from multi-generational Deaf families.

ASL has a lexicon and syntactic structure quite unlike that of spoken English. In ASL, signs refer not to English words, but rather to the concepts or meanings that its users wish to convey and exchange. The linguistic evidence is clear and incontrovertible:  ASL is structurally different from English.

Another way in which ASL differs from English is that it does not have a conventionally accepted written form, *i.e.*, an orthography. This is true of all of the signed languages and many of the spoken languages in the world. There have been several attempts at creating a notation system for recording signed languages, the most notable of which is the Stokoe notation system.[9] However, like the International Phonetic Alphabet used to transcribe spoken languages, the use of the Stokoe notation system has largely been restricted to linguists and is now being replaced by digital video recordings and computer programs that are being used to record and analyze signed languages (*e.g.*, Boston University's SignStream http://www.bu.edu/asllrp/SignStream/ and SportsTec's StudioCode application http://www.sportstecinternational.com/). A more widely used means of trying to record signs is "glossing"[10] in which an English word written in all capital letters is used to refer to a sign. Thus the gloss CAT refers to the sign that is used to represent the object/concept "cat." Glossing has some severe limitations, however. Unlike Stokoe notation, the reader of a glossed transcription must already know

---

[8]     Baker-Shenk, Charlotte and Dennis Cokely. 1980.; Valli, Clayton, Ceil Lucas and Kristin Mulrooney. 2005.
[9]     Stokoe notation is a system of letters, numbers and iconic shapes used to transcribe the handshapes, movements, locations and palm orientations used to produce signs. It was first published in Stokoe, William, Dorothy Casterline and Carl Croneberg. 1965. *A Dictionary of American Sign Language on Linguistic Principles*. Washington, DC: Gallaudet University Press
[10]     Baker-Shenk, Charlotte and Dennis Cokely. 1980.

the sign being referred to in order to approximate the articulation of the sign that was glossed. Also, the same gloss may refer to two different variants of the same sign because glossing does not capture articulatory behaviors. For example, the sign referred to by the gloss COW can be produced with one hand or two; glossing also does not capture the articulatory differences between signers who are right-handed and those who are left-handed nor does it always capture intended semantic intent. Depending upon glosses to "write signs" requires that one assumes the recipient attaches the same articulated sign to the gloss as the author does. For example, the ASL sign that is often glossed as PUBLIC is used to refer to things/events that are "public" (e.g. "public schools; public hearings"). However, this is the same sign that is used to refer to people who are not Deaf (HEARING). So when a Deaf person writes PUBLIC it is not immediately evident what is meant. Despite these limitations, it is not uncommon for Deaf people to use glosses when writing notes or when using a TTY[11] to communicate and, indeed, Deaf people make jokes about the ineffectiveness of using written glosses to communicate with people who are not Deaf[12].

However, glossing is not a written form of ASL; nor is it written English even though the words used are English words. It is practically and linguistically inconceivable that a written two-dimensional form could reliably and easily capture three-dimensional moving signed conversational interactions. Analog and digital video recordings and the use of VideoPhones (discussed in more detail below, but essentially internet signed communication using video web-cams) not only are rapidly replacing TTYs and the need for a written form of ASL, but also have provided a more accurate means of recording and sharing signed interactions.

Deaf people as a group are unable to rely upon their hearing and speech as an effective and primary means of communication. Likewise they also are unable to rely upon means of communication that are based on or derived from speech and hearing such as written English as an effective and primary means of communication. For Deaf people the use of ASL is not simply a matter of convenience or preference. ASL provides the only effective and efficient means of linguistic communication for members of the American Deaf Community.

---

[11]     TTYs will be discussed in greater detail below, but a TTY is a small computer-like device that makes it possible for Deaf people to type to each other over existing phone lines; newer devices are referred to by the acronym TDD – Telecommunication Device for the Deaf.
[12] Rutherford, 1992

**3.2 Limitations of English within the American Deaf Community**.

The acceptance and use of ASL is central to defining and understanding the American Deaf Community. It is clear that Deaf people exist as a linguistic minority within a society in which English is the dominant language. Moreover, there are significant challenges that Deaf people, as a group, face in becoming fluent in English. Some of these challenges are the same as exist for any second language learner; but other, more severe challenges exist for Deaf people. In spite of these significant challenges, one of the widely held misconceptions about Deaf people is that although they do sign, they can read and write English fluently. As with other common misconceptions about Deaf people, this has no basis in fact or reality.

While it certainly is a desirable goal for Deaf individuals to be competent in both ASL and English (just as it is for non-d/Deaf immigrants to be bilingual in spoken languages), the reality is that for the vast majority of Deaf people competence in English is rarely attained. Certainly, the history of the education of Deaf students attests to the fact that for the vast majority of Deaf people acquiring competence in spoken English is virtually unattainable.[13]   Additionally, however, the majority of Deaf people do not attain competence in reading and writing English, those forms of communication being derived from spoken English. According to Karchmer and Mitchell, study after study concludes with the same overriding concern, "…the average performance on tests of reading comprehension for deaf and hard of hearing students is roughly six grade equivalents lower than their hearing peers at age 15."[14] The essential difficulty is that Deaf students are "…caught in a vicious circle: their impoverished vocabularies limit their reading comprehension and poor reading strategies and skills limit their ability to acquire adequate vocabulary knowledge from context."[15] The evidence is overwhelmingly clear – Deaf people, as a group, are not competent users of English.

Deaf people, like most immigrant populations in this country, do attain a level of English that enables them to accomplish basic, routine and reoccurring tasks that involve written English. This

---

[13]     Among others, see Marschark, Marc and Patricia Elizabeth Spencer (eds.). 2003.; Wrigley, Owen. 1996; Lane, Harlan. 1992.

[14]     Karchmer, Michael A. and Ross E. Mitchell. 2003. "Demographic and Achievement Characteristics of Deaf and Hard-of Hearing Students." In Marschark and Spencer (eds.) *Deaf Studies, Language, and Education.* New York: Oxford University Press. Page 27.

[15]     deVillers and Pomerantz 1992.

variety of English has been called "Deaf English"[16] which parallels, but is clearly not as proficient as, the English of those non-deaf people learning English as a second language ("ESL").

Certainly most Deaf people, like many other ESL people, achieve what might be termed "survival" English. This means that, as a group, Deaf people have a level of literacy that enables them to interact with much of the routine written English language that they encounter in their daily lives. It is the repetitiveness, predictability and/or limited context within which this written English occurs that facilitates Deaf people's comprehension. For example, they read street signs, menus, subway directions, advertising posters and flyers and other basic printed material necessary or useful for them to live their lives on a daily basis. As a group, Deaf people might be described as marginal readers. That is, some Deaf people do subscribe to newspapers and magazines, although, in my experience, many seek out those portions of the publications supported by visual material (*e.g.*, the comics page or advertising) or contain familiar arrays of numbers (*e.g.*, the sports page). However, one should not mistake this level of responding to basic English print in routine day-to-day tasks with a level of literacy sufficient to rely upon printed material to read most books or magazines or to gain non-recurring or important information. It is this lack of incidentally acquired information (e.g. from the radio, television, USA Today, magazines etc.) that further disadvantages Deaf people vis-à-vis those who are not Deaf.

Despite the fact that Deaf people interact with printed English at some basic level on an almost daily basis, it would be inaccurate and unsubstantiated to describe the level of literacy of the American Deaf Community as a whole as fluent. Deaf people do communicate via e-mail and TTY conversations, but those communications often read like written (*i.e.*, glossed) versions of what they would sign. Deaf people do write notes to people who are not deaf although their notes are frequently misunderstood due to their lack of proficiency in written English.[17] The point is, that just as in the non-deaf population as a whole, there is within the American Deaf Community a range of literacy. However, the critical point is that the average literacy level of members of the American Deaf Community is significantly lower than and markedly more limited than it is for the population as a whole especially as compared to the non-deaf English speaking community.

According to the Gallaudet Research Institute, "For the 17-year-olds and the 18-year-olds in the deaf and hard of hearing student norming sample, the median Reading Comprehension subtest score

---

16    See Charrow, Veda. 1974; 1975.
17    *See* Rutherford, 1993

corresponds to about a 4.0 grade level for hearing students. That means that half of the deaf and hard of hearing students at that age scored above the typical hearing student at the beginning of fourth grade, and half scored below."[18] Given that literacy levels among the U.S. prison population are generally lower than those among the general population[19] one can reasonably conclude that the literacy levels among Deaf inmates would be lower than the non-deaf inmate population. In fact, given that the generally accepted definition of functional illiteracy is a level of reading and writing skills that is insufficient to manage tasks of daily living and employment that require a level of reading and writing beyond a basic level, one would expect that a greater proportion of Deaf inmates would be considered functionally illiterate than would be the case for the non-deaf inmate population as a whole. The difficulties that a limited level of literacy presents for Deaf people are clearly non-trivial. Consider one study, for example, that showed when one personality test was given to Deaf people using elementary English and again using ASL the results were so different that the investigators concluded it was like giving two different tests.[20] This is significant because the results of the test given in English produced a vastly different and decidedly negative profile of the deaf test taker. The author of the study goes on to describe the difficulties in administering psychological tests to Deaf people:

> Since Deaf test takers in America frequently are not fluent in English, they not only fail to understand test instructions thoroughly, invalidating the results, but also fail to understand the test content itself, as most tests are presented in written English, and in rather high-level English at that.

> One authority estimates that a tenth grade knowledge of English is needed to take most personality tests meaningfully. Yet only one deaf student in ten reads at eighth-grade level or better, and the average deaf student on leaving school has only a third grade command of English.[21]

Relying on standard written English as the primary or only means of communication with or for most Deaf people simply cannot be an effective and efficient means of communication.

It is the ineffectiveness of speech, lip-reading and written English that makes the use of qualified sign language interpreters necessary for effective communication when communicating with Deaf

---

[18]     http://gri.gallaudet.edu/Literacy/.
[19]     Alaska Justice Forum 24(2): 2-4.
[20]     Lane, Harlan, 1992.
[21]     *Id.*

people. The use of qualified sign language interpreters is also an important means of effective communication for those late-deafened deaf adults who have learned to sign.

### 3.3 Limitations of Lip-reading and Speech within the American Deaf Community

As challenging and ineffective as it is for Deaf people, as a group, to communicate in written English, it is even more challenging, ineffective and impractical for them to communicate successfully via lip-reading (also called speech-reading). Given the challenges Deaf people have in acquiring competence in written English, this should not be surprising. Unlike the permanent presence of the printed word, making repeated readings possible, the spoken word is ephemeral. Given that Deaf people struggle for accurate and complete comprehension with the stationary written word, one cannot expect any greater level of competence or effectiveness when Deaf people try to comprehend the fleeting spoken word as it appears on the speaker's lips.

A common misconception that most non-deaf people have is that all Deaf people can lip-read. They mistakenly believe that, lacking one of their senses, *i.e.*, the ability to hear, Deaf people's visual sense – and hence their ability to lip-read — becomes more acute in order to compensate. Most non-deaf people do not understand or appreciate the difficulties and limitations involved in trying to lip-read. It is extremely challenging to lip-read English because only a small fraction of the sounds used in the language are clearly visible. In fact even someone who is fully fluent in, and who has full auditory access to, spoken English would struggle to lip-read English (non-deaf people have only to turn their television on and turn off the volume to experience this frustration firsthand). Consider the difficulty in trying to lip-read accurately the spoken English phrase "white shoes." To a person trying to lip-read this, the phrase could be understood as "white shoes" or "why choose." When we consider the fact that many of the sounds in English look the same to a lip-reader, it should not be surprising that Deaf people's comprehension of spoken language is usually quite poor and is even worse than their competence in written English.

According to Bernstein and Auer, "[e]stimates of the upper extremes for the accuracy of lipreading words in sentences have been as low as 10-30% words correct."[22] This is in keeping with

---

[22]     Bernstein, Lynne and Edward Auer, Jr. "Speech Perception and Spoken Word Recognition." In Marschark and Spencer (eds.) *Deaf Studies, Language, and Education*. New York: Oxford University Press. 2003. Pg. 381.

earlier work[23] that also provides evidence that speech-readers understand only about one fourth of what is said in dyadic (one-to-one) conversations.

Of course, there are a number of other uncontrollable factors beside the phonetic structure of English that make it extremely difficult for d/Deaf people to lip-read with any consistent degree of accuracy.  These include, but are by no means limited to, a person's facial bone structure, facial musculature, facial hair, lighting and rate of speech. Given the inherent linguistic difficulties in lip-reading and the additional complications that arise from external factors, it is no wonder that any lip-readers' comprehension, deaf or not, is so limited.

It is true that many late-deafened individuals can be rather skilled lip-readers in some very controlled conditions (although the factors listed above will also negatively impact their lip-reading accuracy). This is because, unlike those with childhood onset deafness, they have adult competence in spoken English to assist in making educated guesses. If lip-readers understand only approximately a quarter of what is said in dyadic (one-to-one) conversations, it should not be surprising that the level of comprehension in group interactions (both small and large) is significantly less. One reason for this is simply physical distance; the further away one is from a speaker the more difficult it is to discern the fine muscle movements of the mouth necessary to lip-read. Another reason is because small group interactions in which a majority of the participants is not deaf generally rely upon turn-taking regulatory mechanisms that are auditorily determined, *i.e.*, whoever talks first or loudest claims the floor. This places the d/Deaf lip-reader in an impossible position of trying to track who is speaking by waiting for others in the group to look at the person who is speaking. But this not only means that the deaf person always misses the first several seconds of what the speaker has to say but is furthermore unable to track who will next claim the floor and is also unable to claim a turn for themselves. Large groups pose even greater problems for the lip-reader, such as greater physical distance from the primary speaker, whether or not the primary speaker moves about while talking, variable lighting, and the impossibility of lip-reading questions or comments from anyone else in the large group.

Given lip-readers' limited comprehension in one-to-one interactions and given the increased interactional complexities in small and large group interactions, lip-reading cannot be assumed to be an effective and meaningful communicative option for d/Deaf people.

---

[23] Liben, Lynn. 1978. *Deaf Children: Developmental Perspectives*. New York: Academic Press.

Of course, even if d/Deaf people could lip-read with any reasonable level of accuracy, successful communication in those settings would also require that they then express themselves in intelligible spoken English. And, unlike late-deafened adults, they have significant difficulties doing so. Some Deaf people have speech that may be understood in limited contexts; most, however, do not. Despite years of speech training most Deaf people are generally unable to regulate the volume, timbre or pitch of their speech and that, among other factors, makes their speech very difficult to understand. Deaf people, never having heard themselves speak, cannot monitor their speech in the way that non-deaf people can. Simply put, Deaf people don't know how words are supposed to sound; without such an auditory target they can only approximate the vocal formulation of words. Thus, the speech of Deaf people ("Deaf Speech") has been described as guttural, animalistic and unintelligible.

As a general matter, Deaf people know that their speech is ineffective as a primary means of communication. They know that those unfamiliar with Deaf Speech have great difficulty understanding their speech and not to trust their speech for important interactions. They know that their speech sounds unnatural and that non-deaf people generally react negatively when they do use their speech. And thus, unlike late-deafened adults, most Deaf people choose not to use their speech for routine communicative interactions because they know it is generally unintelligible and therefore not an effective means of communication or, in many cases, they simply cannot use their speech.

For d/Deaf people as a group then, lip-reading and speech cannot be assumed to provide a reliable and accurate means of communication in most interactions. The clear reality is that the only practical way for Deaf people to participate effectively in "high stakes" one-to-one interactions (*e.g.*, interactions related to safety, discipline, medical or mental health interactions, job performance and the like) and in any small or large group interaction is to employ the services of a qualified sign language interpreter.

## 3.4 Options for Communicating with Deaf People

Since the early seventies, Deaf people have used TTYs to communicate with each other and, later, with non-deaf people who did not have TTYs. TTYs consist of a keyboard, display screen and a modem that when connected to a telephone converts typed characters into acoustic signals. Using telephone lines, Deaf people can communicate directly with someone else who also has a TTY. Deaf people can also use TTYs to communicate with those who are not Deaf and do not have a TTY by using

the free, federally-funded Telecommunications Relay Service ("TRS"). Operators who have telephones and TTYs facilitate the phone call, typing with the Deaf person and speaking with the non-Deaf person. TTY conversations take significantly longer than spoken conversations over the telephone. This is because either both participants in the conversation are typing (something that always is slower than speaking) directly with one another, or the Deaf participant is typing and the relay operator is speaking with the non-Deaf participant and typing with the Deaf participant. Although TTYs and free TTY relay services have provided communication access for d/Deaf people (especially when compared to what was available before widespread use of TTYs), the fact is that TTY technology is inefficient and has rapidly become obsolete.

During the past ten years, however, Deaf people have rapidly and eagerly replaced their TTYs with VideoPhones (videophones which are essentially webcams requiring internet access). Deaf people who have internet connections have replaced their TTYs for very understandable reasons: first, TTYs require communication in typed English (the second language for most Deaf people and a language in which, as noted above, they rarely attain any significant level of fluency) and second, VideoPhones enable Deaf people to communicate using ASL, a language in which they are much more comfortable and fluent. With a VideoPhone the need for Deaf people to have a dedicated telephone line in order to use a TTY is obviated.

As with TTYs, if each party has a VideoPhone then they can communicate directly (point-to-point communication); however, if only one party has a VideoPhone, communication is then only possible using a free federally funded Video Relay Service ("VRS") provider. Either party can initiate communication by connecting with a VRS provider and a VRS interpreter will facilitate the call, communicating via VideoPhone with the Deaf caller and via voice with the non-Deaf caller. VideoPhone equipment is provided at no cost by companies that provide VRS services (*e.g.*, Sorenson (www.sorenson.com/), Z (http://www.zvrs.com/), and Purple (http://www.purple.us/)). With VRS, none of the parties is located in a shared physical location. As with TRS, VRS is federally funded and, apart from the cost of the internet connection itself, is a free service funded by and overseen by the Federal Communications Commission. It is important to note that while direct VideoPhone to VideoPhone conversations can happen at speeds approaching spoken conversations over the telephone VideoPhone conversations utilizing VRS are much more efficient than TTY conversations using a TTY relay service.

Companies that provide VRS services also provide Video Remote Interpreting ("VRI") services. Using technology similar to that used in VRS, the interpreter does not have to share the same physical location as the two principal parties. Thus, in medical settings, for example, the doctor and the Deaf person share the same physical location but a VRI cart (a large television monitor that is paired with the VRS hardware) allows the interpreter to be in a remote location. VRI is increasingly used in settings where the need for a qualified, certified interpreter arises and there is insufficient time to schedule an interpreter in advance. (Here it is worth noting that VRI and VideoPhones use the same technology. BOP has proposed providing interpreting services via VRI and thus it is puzzling why BOP refuses to allow Mr. Berke access to a VideoPhone). Unlike VRS, however, there is a cost for VRI; some companies have monthly plans while others charge by the minute; some companies have limited VRI availability, while others offer 24/7 service. While VRI is not appropriate for all settings (*e.g.*, educational settings, workshops, large group settings), it can be an effective way to provide communicative access in many one-to-one settings and, in general, can be less costly than an in-person interpreter.

**Opinions with respect to Deaf People as a Linguistic Community:**

There are many unfounded stereotypic assumptions about d/Deaf people, their means of communication and their signed language.

The most significant factor uniting members of the American Deaf Community is their use of ASL.

Native signers, especially those from multi-generational families are especially valued.

ASL is neither a manual form nor a derivative form of English and thus there is not a one-to-one correspondence between ASL signs and English words.

The grammatical and syntactic structure of ASL is quite different than the grammatical and syntactic structure of English.

There is no conventional written form of ASL.

As a group, Deaf people face severe challenges in acquiring competence in English and Deaf people rarely attain competence in English.

The average English literacy level of the American Deaf Community is significantly lower than and more limited than it is for the population as a whole.

Lip-reading for the vast majority of Deaf people and for many deaf people is so unreliable that it cannot be used to ensure comprehension and effective communication.

The use of speech for the vast majority of Deaf people is so ineffective that it cannot be relied upon to ensure accurate expression and effective communication.

The only way for Deaf people and for some deaf people to participate meaningfully and effectively in "high stakes" one-to-one interactions (*e.g.*, interactions related to health, safety, and discipline) is to provide a qualified sign language interpreter.

The only way for d/Deaf people to participate meaningfully and effectively in small or large group interactions is to provide a qualified sign language interpreter.

TRS services make it possible for d/Deaf people with TTYs to communicate in written English (*i.e.*, not ASL) with those who are not d/Deaf. However, communicating via TTY takes longer than communicating using ASL or spoken English and is not particularly effective because of its reliance on English.

Deaf people are rapidly replacing TTYs with VideoPhones as their primary and preferred means of communicating with each other and with non-deaf people.

VRS services make it possible for d/Deaf people with a VideoPhone to communicate in ASL with those who are not Deaf and with d/Deaf people who have a VideoPhone. Communicating via VideoPhone with VRS is much more efficient than communicating via TTY.

VRI offers a cost-effective means of ensuring that interpreting services can be provided in situations in which it is not possible to schedule an in-person interpreter.

## 4. Sign Language Interpretation

Given the passage of federal laws, like the Rehabilitation Act, beginning in the early 1970s, it is safe to say that most non-deaf people have, at one time or another, seen a sign language interpreter. However, as with other aspects of the lives of d/Deaf people, there are several common misconceptions and incorrect assumptions concerning sign language interpreters.

The first widely held misconception by those who are not Deaf is that ASL is easy to learn and thus one can rather quickly gain fluency in ASL and then become a qualified sign language interpreter. They mistakenly think that ASL is nothing more than making pictures in the air and can be learned quickly and easily. However, learning ASL is as challenging as learning any spoken language; in fact given the modality differences, many non-deaf students find it more challenging to learn ASL than to learn a spoken foreign language.[24]

Another misconception (discussed above) about sign language interpreting is that signs exist in a one-to-one relationship with English words: that for every word there is a sign that conveys that word. Were this true it would mean that interpreting would consist simply of learning the matched signs for the words one already knows and the rather mechanical process of producing the linked signs for the English words one hears and, conversely, the spoken words for the signs one sees. However, anyone who has studied another language knows that vocabularies of any two languages do not map in a one-to-

---

[24]     Peterson, 1999.

one relationship; this is a cross-cultural and linguistic reality well supported by the literature.[25] Like other languages, ASL and English do not map to each other in a one-to-one relationship. This is also well supported by the literature.[26]

Another widely held misconception is the belief that anyone who can sign can be a qualified sign language interpreter. The fact is that competence in ASL is a necessary, but not sufficient, condition to become a qualified sign language interpreter. This necessary, but not sufficient, condition of bilingualism is true for all interpreters whether of spoken or signed languages and the literature is quite clear on this point.[27]

To begin to understand the cognitive challenges and complexities of interpretation, and why competence in ASL is a necessary, but not a sufficient prerequisite in itself to qualify one as an interpreter, it is helpful to have a clear statement of what interpretation is. The following definition provides such a starting point:

> Interpretation is the competent and coherent use of one naturally evolved language to express the meanings and intentions conveyed in another naturally evolved language for the purpose of negotiating an opportunity for a successful communicative interaction in real time within a triad involving two principal individuals or groups who are incapable of using, or who prefer not to use, the language of the other individual or group.[28]

This is a general definition of interpretation that applies to signed and spoken language interpretation and one that is well supported in the literature.[29] This definition places in proper context the necessary, but insufficient, condition of bilingualism needed to interpret. Indeed, it is the ability to not just determine meaning and intention, but then also to express that meaning and intention that is at the heart of interpretation.

The cognitive processes by which meaning and intention are determined and then expressed in a different language are quite complex. It has only been in the last quarter of a century that we have begun to understand the process of interpretation.  In the past three decades, various models of the cognitive

---

[25]     e.g. Larson 1998; Lyons, 1977; 1995; Duranti, 1997; Crystal, 1997; Hatim and Mason, 1997; Weaver, 1997).
[26]     e.g. Stokoe, 1965; Cokely, 1992, 2001; McIntire (ed) 1986; Mindess, 1999
[27]     e.g. Seleskovitch, 1978; Frishberg, 1986; Wadensjö, 1998; Cokely, 1992; Stewart et al, 1998; Janzen, 2005
[28]     Cokely, Dennis. 2001 "Interpreting Culturally Rich Realities: Research Implications for Successful Interpretation." *Journal of Interpretation*: Millennial Edition, pg. 4.
[29]     e.g. Robinson, 1997; Wadensjö, 1998; Larson, 1998; Stewart et al, 1998; Pöchhacker, 2004; Janzen, 2005

process have emerged that have helped shape and guide our understanding of interpretation, research into interpretation, and the training of interpreters.[30] Examining any of these models makes clear that excellent skill in both languages is unquestionably a necessary, but not sufficient, prerequisite for interpreters. In fact, in the case of qualified sign language interpreters, national certification by the Registry of Interpreters for the Deaf ("RID") evolved, in part, to differentiate between those who could sign and those who could interpret.[31]

Interpretation generally takes one of two forms – consecutive or simultaneous interpretation. Consecutive interpretation often happens in one-to-one interactions such as doctor's appointments, supervisor meetings and in some legal settings. In diplomatic situations it may be used when delegates or diplomats deliver speeches. In consecutive interpretation one of the participants speaks or signs and, at a logical semantic or syntactic point, pauses. The interpreter, who may have been taking notes, then begins to interpret what was just said or signed. When the interpreter is done, the speaker continues until the next pause at which time the interpreter begins. This alternating pattern continues until the speaker is finished. In general, interpreters and participants agree beforehand if the interpretation will proceed consecutively. In one-to-one interactions the logical pause points may, for instance, be the conclusion of one of the participant's turns (*e.g.*, asking a question).

Simultaneous interpretation happens without benefit of regular and planned pauses and often happens in interactions such as presentations, classroom lectures and meetings The term "simultaneous" interpretation is actually a misnomer; in simultaneous interpretation the interpretation is delivered in the same general time frame as the original. No interpretation is delivered perfectly synchronous with the delivery of the original message. Because the interpreter's goal is to render the meaning and intent of the original message, the interpreter must first comprehend it. To do so requires that the interpreter wait to receive enough of the original message so that the interpreter is confident in the intended meaning of the speaker or signer (what interpreters call "chunking the message"). Thus, there is always a small temporal discrepancy between the production of the original message and the production of the interpretation of the original message. This temporal difference is called lag time (or sometimes by the French term décalage).

For at least the last four decades it has been widely accepted within the Deaf Community and among those who work with Deaf people, including interpreters, that for non-social communicative

---

[30]   e.g. Moser-Mercer, 1978; Chernov, 1978; Cokely, 1984, 1992; González et al, 1991
[31]   Cokely, Dennis. 2001.

interactions between Deaf people and those who are not deaf and who cannot sign fluently, consecutive or simultaneous interpretation is the only viable option to ensure that Deaf people have effective communicative access and have reliable opportunities for participation.[32] At the present time, no other reasonable accommodation can successfully enable Deaf people and those deaf people who can sign to participate in and benefit from small and large group interactions in real time. One has only to look at the prevalence of interpreters in the education, business, religious, entertainment and social service segments of American society to realize the widespread recognition and acceptance of the reality that interpreters are the only viable option for Deaf people in such settings.

The national professional organization for qualified sign language interpreters in the United States is the RID. Founded in 1964, the RID currently has over 13,000 members nationwide and has chapters in almost every state. The RID website (http://www.rid.org/index.cfm?) has a searchable directory of its membership, making it relatively easy to find an interpreter. In 1972, the RID implemented a national evaluation and certification system to provide a ready means of identifying those individuals deemed qualified to interpret. As mentioned previously, the certification system was motivated, in large part, by an expressed need to differentiate between those who could sign and those who could interpret.[33] For the past twenty-five years the assessment procedures have been implemented, revised and monitored using acceptable psychometric procedures to ensure their validity and reliability.

In addition to the generalist certificates, the RID currently certifies interpreters specifically to work in legal and K-12 settings. According to the RID's 2007 Standard Practice Paper on Legal Interpreting:

> Legal interpreting encompasses a range of settings in which the deaf person interacts with various parts of the justice system. Legal interpreting naturally includes court interpreting; however, a legal interpreter's work is not restricted to the courtroom. Rather, legal interpreting occurs during attorney- client conferences, investigations by law enforcement, depositions, witness interviews, real estate settlements, court-ordered treatment and education programs and administrative or legislative hearings. Legal interpreting requires highly skilled and trained specialists because of the significant consequences to the people involved in the event of a failed communication.[34]

National assessment and certification of interpreters is a significant factor in assuring that an individual possesses the range of competences and capabilities needed to render effective interpretation.

---

[32]   e.g. Cokely, 2005; 2001; 1992; McIntire, 1986; Mindess, 1999; Stewart, et al 1998.
[33]   Cokely, 2005.
[34]

    http://www.rid.org/UserFiles/File/pdfs/Standard_Practice_Papers/Drafts_June_2006/Legal_Interpreting_SPP.pdf

As mentioned above, the RID has been certifying interpreters since 1972. However, in the late 1970s many states began developing their own instruments to assess prospective interpreters or purchasing an assessment instrument from another state. These instruments tend to be less rigorous than the national assessments but, in many cases, they serve as a "stepping stone" to national certification qualifying individuals to work as interpreters in low risk settings. More recently a number of states have either introduced legislation to require or already require that interpreters hold state licenses that, as a prerequisite, require that one must hold national or state certification or must be in the process of obtaining national certification from RID. For example, Arizona, Florida and Pennsylvania each have state licensure that requires that an interpreter must hold certification from the RID or be in the process of obtaining RID certification.

Independent assessment by a third party is the only way to ensure that those claiming to be able to interpret are actually qualified to do so; that they are actually "able to interpret effectively, accurately and impartially both receptively and expressively, using any necessary specialized vocabulary.". Since 1980 those who know little or nothing about Deaf people, ASL, or interpreting have become those responsible for hiring interpreters and thus independent assessment of one's competence has become especially important. Absent knowledge of ASL and interpreting and absent an independent assessment of interpreter competence, the uninformed are easily mislead into thinking that someone who knows a handful of signs is qualified to interpret. Additionally, certified interpreters are bound to a Code of Professional Conduct[35] which pledges them to, among other tenets, confidentiality, neutrality, discretion and respect for consumers. Absent adherence to these tenets, one cannot claim to be a qualified interpreter.

Independent assessment is especially important when one considers the variation that exists in ASL. All languages exhibit sociolinguistic variation. Sociolinguistic variation will include, for example, age variation (senior citizens and teenagers may use different vocabulary), gender variation (men and women may use different vocabulary and grammatical structures) and geographic variation (people from different parts of the country may have distinct accents and/or linguistic patterns). Despite such natural variation, teenagers still communicate with senior citizens, men communicate with women, and people from different parts of the country communicate with each other. The critical point is that naturally

---

[35] Registry of Interpreters for the Deaf Code of Professional Conduct, http://www.rid.org/ethics/code/index.cfm

occurring sociolinguistic variation does not impede communication among different members of a linguistic community.

ASL, as is true of all signed and spoken languages, also exhibits natural sociolinguistic variation.[36] This means, for example, that older Deaf people may sign slightly differently than younger Deaf people, Deaf people from the North may sign slightly differently than Deaf people from the South, and Deaf people from various educational backgrounds may sign slightly differently from each other. Nevertheless, just as with spoken English, such naturally occurring linguistic variation does not preclude Deaf people from communicating effectively with each other. Certification of interpreters at a national or state level provides a readily identifiable measure of assurance that the certificate holder possesses the knowledge and communicative flexibility necessary to interpret successfully for groups of diverse Deaf people that embody naturally occurring sociolinguistic variation.

**Opinions with respect to Sign Language Interpretation:**

>    Competence in ASL and English is a necessary, but not sufficient, condition to become a qualified sign language interpreter.
>    The cognitive processes involved in interpretation are extremely complex and require the ability to determine meaning and intent.
>    For non-social communicative interactions between Deaf people and those who are not deaf and who cannot sign fluently, consecutive or simultaneous interpretation provided by a qualified interpreter is the only viable option to ensure that Deaf people have effective communication.
>    Certification of interpreters at a national or state level provides a readily identifiable measure of assurance that the certificate holder possesses the knowledge and communicative flexibility necessary to interpret successfully for groups of diverse Deaf people that embody naturally occurring sociolinguistic variation.
>    Certified interpreters are bound to abide by a Professional Code of Conduct that seeks to ensure that no personal bias or self-serving interests colors their interpretations.
>    The RID maintains a searchable membership database, accessible to the general public and to the BOP, which makes it easy to locate certified interpreters.

**5. Treatment of Mr. Larry Berke by the BOP**

It should be unquestionably clear that Mr. Larry Berke is a member of the American Deaf Community – his parents, grandparents and great grandparents were all Deaf and his two older sons are Deaf making them the fifth generation. During my interview with Mr. Berke on September 7, 2012, he

---

[36]     e.g. Woodward, 1994; Lucas, 2001

demonstrated a very advanced level of proficiency in ASL, which should not be surprising given his family background and his experiences interacting with other Deaf people in schools and in clubs for Deaf people. In fact, until rather recently Mr. Berke served as the President of two Deaf Clubs in the Phoenix area.

Based on a review of documents provided to me (*see* appendix B) and based on my meeting with Mr. Berke on September 7, 2012, it is clear that ASL is the only viable means of effective and efficient communication with him. Given this, there are several ways in which ineffective and inefficient communication with Mr. Berke and denial of communicative access for Mr. Berke will result unless the BOP commits to taking appropriate steps.

a) **Visual alarms and alerts:** Because Mr. Berke is profoundly Deaf he will not be able to hear announcements, commands or alerts that are auditory in nature such as those broadcast over a PA system. Because he cannot read lips he will be unable to understand announcements, commands or alerts that are spoken to him with a degree of accuracy that would ensure effective and efficient communication with him. The clear danger here is that an inmate or corrections officer might deliver a spoken command to Mr. Berke but will have no idea whether the spoken command has been understood.

It is my opinion that a visually based, non-aural method of notification capable of distinguishing between events such as a lighted signal board is necessary to provide Mr. Berke with the same level of information, independence and communicative access as other non-deaf inmates.

b) **Telephone communication:** The BOP claims that provision of a TTY will allow Mr. Berke to communicate with members of his family and his friends. For Deaf people TTYs have largely been replaced by VideoPhones over the past ten years for very understandable reasons:  first, TTYs require communication in typed English (the second language for most Deaf people and a language in which, as noted above, they rarely attain any significant level of fluency). Given the limited level of fluency in English attained by Deaf people as a whole, the likelihood of miscommunication is significant.

Second, VideoPhones enable d/Deaf people to communicate using ASL, a language in which they are much more comfortable and fluent. With a VideoPhone, Mr. Berke could communicate directly with another party if they also have access to a VideoPhone.  If calling someone who does not have a VideoPhone, Mr. Berke would use the VideoPhone to call a VRS interpreter call

center where a qualified ASL interpreter would answer. Mr. Berke would then provide the phone number he wished to call and the qualified ASL interpreter would place the call. Mr. Berke would sign to the interpreter who would then speak to the non-deaf person on the other end of the phone line and vice versa.

During my interview with Mr. Berke he informed me that not only does he have no telephone line in his house, but his current wife has never used a TTY. His first wife who is extremely ill suffering from cancer and currently residing in California also has no TTY and exclusively uses a VideoPhone to communicate with family and friends. Mr. Berke's second oldest son has moved to California to be with his mother during her illness and thus only has access to a VideoPhone. His three youngest children have never used a TTY and his two youngest, aged eight and four, do not possess sufficient proficiency in written English to communicate effectively and efficiently via a TTY. In fact, during my interview with Mr. Berke I had the opportunity to interact with his youngest daughter and can indeed confirm that she lacks a level of proficiency in written English to communicate via TTY.

Mr. Berke also maintains a real estate rental business in Washington DC with his Deaf brother with whom he communicates daily via VideoPhone. His brother has no telephone line in his house. Mr. Berke also reports that he communicates weekly via VideoPhone with his son (who is at Gallaudet University in Washington DC), his mother in-law, father in-law and his sister in-law. Mr. Berke also is also frequently sought out for advice via VideoPhone from members of the Phoenix Deaf Community.

It is my opinion that the BOP must make at least one VideoPhone available to Mr. Berke and make it possible for him to access point-to-point calls (*i.e.*, VideoPhone to VideoPhone) as well as to access a VRS provider in order for him to have the telephone services and benefits that are comparable to those afforded non-deaf inmates. No other accommodation (*e.g.*, provision of a TTY) would provide a comparably effective level of access. Indeed, in my opinion provision of a TTY in lieu of a VideoPhone would place an undue hardship and burden on Mr. Burke, members of his family and his friends.

**d) Interpreting Services:** The BOP has stated that they will provide an "inmate companion" for Mr. Berke. It is unclear what BOP means by this. If BOP means a non-deaf inmate who knows some

sign language, then BOP must be absolutely clear that this "inmate companion" cannot function as an interpreter.

Here it is worth stressing that there is a difference between "social signers" (*i.e.*, individuals who know how to sign and may, in some very limited and low risk situations, be able to facilitate communication between d/Deaf and non-deaf people) and qualified, certified interpreters. The level of competence achieved by "social signers" is clearly not at the level of fluency required to interpret with accuracy, fidelity and fluidity.

Without proper training "social signers turned interpreters" are likely to be unaware of the linguistic and structural differences between ASL and English. Without proper training, these "social signers turned interpreters" are likely to think that the goal of interpreting is nothing more than rendering a sign for each word they hear or vice versa. They do not realize that the essence of interpretation lies in determining meaning and intent and, as discussed above, discarding the form (*i.e.*, the words or signs) of the original message. Without proper training, these "social signers turned interpreters" are likely to be unable to manage and control lag time in order to deal with more structurally dense or complex messages.

Another, perhaps more important issue that must be considered is that these "social signers turned interpreters" will often have an interest in the material that they are signing or speaking. Someone acting as an interpreter who has a vested interest in the outcome of an interaction (*e.g.*, a person with a vested interest in whether a disciplinary meeting ends in a certain way) will be unable to maintain the level of neutrality required to accurately communicate the interaction. By contrast, RID and/or state qualified/certified interpreters provide a level of measured, objective neutrality in their work, while signing co-workers may be unable to do so. Much like doctors and lawyers, certified interpreters are bound by a professional code of ethics and conduct and pledge to maintain neutrality, impartiality and objectivity in their work; "social signers turned interpreter" are bound by no such code of ethics or ethical code of conduct.

Absent any professional qualifications, if BOP intends to provide Mr. Berke with an "inmate companion" who can sign, it must take every step to ensure that this "inmate companion" does not attempt to "interpret" for Mr. Berke in any situation in which

confidential information will be exchanged or divulged (e.g. medical appointments, counseling sessions). To the extent that this "inmate companion" does provide "incidental interpreting services" BOP must be aware that such an individual is most likely not able to "interpret effectively, accurately and impartially both receptively and expressively using any specialized vocabulary". Such "social signers" are also not able to provide the level of communicative access needed for interactions such as educational classes, informational programs or training sessions.

**d) Providing adequate communicative access:** Since it appears that the BOP does not intend to provide Mr. Berke with appropriate visual alarms/signals, will not provide Mr. Berke with an equivalent level of telephonic communication, and may not provide Mr. Berke with an adequate level of services of a qualified interpreter, I believe that the following remedies must be put in place in order for Mr. Berke to have a similar level of communicative access as non-deaf inmates:

1) The BOP must employ qualified, professional, credentialed interpreters for "high stakes" interactions involving Mr. Berke which clearly include, but are not limited to, doctor's and nurse's appointments, appointments with psychologists/psychiatrists and/or other mental health professionals, meetings with the Warden or other officials within the BOP, classes and/or educational opportunities. In my opinion, failure to do so means that the BOP cannot accurately state that it is providing Mr. Berke "an interpreter who is able to interpret effectively, accurately and impartially both receptively and expressively, using any necessary specialized vocabulary." (Interestingly, the BOP has stated that it will provide Mr. Berke with VRI services – provision of these services require the precise technical internet connectivity required to afford Mr. Berke VideoPhone access, so it is puzzling and troubling why the BOP would refuse to provide Mr. Berke with access to VideoPhone connectivity).

2) The BOP must provide Mr. Berke with access to a VideoPhone that will allow Mr. Berke the same level of telephonic freedom experienced by non-deaf inmates. This will enable Mr. Berke to place calls directly to those who also have a VideoPhone or, using the free FCC-funded VRS interpreters, to place calls to friends, family and other individuals with whom he may wish to have contact, *i.e.*, the same telephonic access

provided to non-deaf inmates. (See #1 above regarding the question of internet connectivity).

If calling someone who is not deaf and who does not have a VideoPhone, Mr. Berke would use the VideoPhone to call a VRS interpreter call center where a qualified ASL interpreter would answer. Mr. Berke would then provide the phone number he wished to call and the qualified ASL interpreter would place the call. Mr. Berke would sign to the interpreter who would then speak to the non-deaf person on the other end of the phone line and vice versa. To my knowledge, there is no way, and no means through relay services, however, for Mr. Berke to call a VideoPhone from a TTY.

As noted above, a telephone line is required for TTY devices, but is not required for the VideoPhones that most Deaf people now use.  During my interview with Mr. Berke he informed me that not only does he have no telephone line or TTY in his house, but his current wife has never used a TTY.

3)  The BOP must install VRI units in strategic locations given that it is not reasonable or practical for USP Tucson (or any future facility in which Mr. Berke may be housed) to have an on-staff interpreter present at all times. While it is true that, for most interactions, a physically present interpreter is preferred whenever possible, technology now offers another option that was not practical or reliable even a few years ago. VRI is becoming more and more common in fixed location settings that have unpredictable interpreting needs, including in hospitals, emergency facilities and training facilities.

In my opinion, the use of VRI minimally in the main medical department, other frequently visited medical facilities, and the Warden's office is necessary to provide a much more appropriate level of communicative access for Mr. Berke and would do so in a timely manner. Mr. Berke would not be required to wait for the arrival of an "in-person" interpreter. VRI service is an on-demand service, available seven days a week, twenty-four hours per day and some companies will bill only for minutes used rather than to the nearest half hour. By using VRI to supplement the physically present interpreter, Mr. Berke and officials at the BOP will never have to experience inordinate and inappropriate delays in being able to communicate efficiently and effectively with each other. This will also ensure that the BOP is providing "an interpreter who is able to

interpret effectively, accurately and impartially both receptively and expressively, using any necessary specialized vocabulary" because interpreters employed by VRI services are qualified and certified ASL interpreters.

It is my opinion that VRI should be used to supplement, but definitely not replace a regularly scheduled physically present interpreter. There are a number of interpreted interactions that are best handled with a physically present interpreter or will occur in physical locations not equipped for VRI. These interactions must be analyzed to determine the number of hours for which a physically present interpreter is scheduled.

**Opinions with respect to treatment of Mr. Berke by the BOP:**

- Reliance upon written communication with Mr. Berke is an inefficient and ineffective means of communicating with Mr. Berke.
- Reliance upon verbal commands, announcements and signals is an ineffective and inefficient means of communicating with Mr. Berke.
- Reliance upon a flashing light to signal all moves is not an effective nor an efficient way to communicate the nature of such moves to Mr. Berke.
- Provision of a lighted signal board, vibrating pager or other non-aural method of communication is necessary to provide Mr. Berke with the same level of information, independence and communicative access regarding moves as non-deaf inmates.
- Provision of a VideoPhone and access to VRS is necessary to provide equivalent telephonic services to Mr. Berke.
- To the extent that the BOP allows "an inmate companion", a person who is not "an interpreter who is able to interpret effectively, accurately and impartially both receptively and expressively, using any necessary specialized vocabulary," to provide "interpreting" services for Mr. Berke in medical settings, I believe the BOP treats Mr. Berke differently than it treats non-deaf inmates with regard to Mr. Berke's healthcare privacy expectations.
- Provision of qualified sign language interpreter services is the only way to provide access and effective communication for Mr. Berke to the same educational, training and self-improvement programs available to non-deaf inmates.
- Provision of qualified sign language interpreter services is the only way to provide access and effective communication for Mr. Berke in "high stakes" interactions such as meetings with medical personnel, meetings with the Warden, meetings involving disciplinary matters and educational/training classes.
- VRI is the best way to provide Mr. Berke with effective and equivalent access to "an interpreter who is able to interpret effectively, accurately and impartially both receptively and expressively, using any necessary specialized vocabulary" in emergency situations.

- VRI equipment in the medical department, the Warden's office and, possibly other key locations, throughout the facility is the best way for the BOP to ensure effective communication with Mr. Berke in emergency situations.

## 6. Conclusion

Members of the American Deaf Community are a linguistic and cultural minority. The language that binds them together and is the critical determinant for membership in the Community is ASL. The majority of people who are not deaf have incorrect and stereotypic misconceptions about Deaf people and ASL. They believe that d/Deaf people can lip-read with a degree of accuracy that will enable meaningful communication, when in reality the level of accuracy for most d/Deaf people is at best 30%. Those who are not deaf believe that Deaf people can read and write fluently in English when in reality the average Deaf person reads at approximately a fourth grade reading level. Those who are not deaf fail to understand that in order for communication with d/Deaf people to be effective and efficient that communication must be visually clear and unambiguous.

If the BOP intends to install a flashing light that is used to signal inmates "moves", the BOP must be aware that this flashing light provides no information to Mr. Berke about which specific move is being signaled. A light board that would display specific moves, a vibrating pager or similar non-aural method of notification would provide Mr. Berke with the same access to information as non-deaf inmates are provided by spoken PA announcements. For extended meaningful and serious communicative interactions, communicative access for Mr. Berke can only be provided by employing the services of a qualified sign language interpreter.

Also, BOP must be aware that an "inmate companion" is not a qualified interpreter as that companion is not "an interpreter who is able to interpret effectively, accurately and impartially both receptively and expressively, using any necessary specialized vocabulary." In addition to a physically present qualified sign language interpreter(s), technology has made it possible to use the services of a VRI (the same technology used to provide VideoPhone access), when it is impractical to have a physically present interpreter. VRI provides the only meaningful way to ensure accurate and effective communication in emergency situations.

The only way to provide Mr. Berke with telephone services and benefits that are equal to those afforded non-deaf inmates is the provision of a VideoPhone and access to VRS.

Based on my experience of over forty-four years and my review of the record and given what BOP proposes to accommodate Mr. Berke, I believe that Mr. Berke will be denied effective communication by the BOP.

Finally, I understand that discovery has not yet been completed. As additional information becomes available as a result of discovery, I expect to examine that material and expand upon the opinions offered in this report.

# References

Alaska Justice Forum 24(2): 2-4. National Assessment of Adult Literacy and Literacy Among Prison Inmates. Justice Center, University of Alaska Anchorage. (Summer 2007).

Baker, Charlotte and Robbin Battison (eds.). 1980. *Sign Language and the Deaf Community: Essays in Honor of William C. Stokoe*. Silver Spring, MD: National Association of the Deaf.

Baker-Shenk, Charlotte and Dennis Cokely. 1980. *American Sign Language: a Teacher's Resource text on Grammar and Culture*. Washington, DC: Gallaudet University Press.

Bernstein, Lynne and Edward Auer, Jr. 2003. "Speech Perception and Spoken Word Recognition." In Marschark and Spencer (eds.) *Deaf Studies, Language, and Education*. New York: Oxford University Press.

Brown, C. M. (1988). Human-computer interface design guidelines. Norwood, NJ: Ablex Publishing.

Charrow, Veda. 1974. Deaf English: An Investigation of the written English Competence of Deaf Adolescents. Unpublished dissertation. Stanford University.

Charrow, Veda. 1975. "A Psycholinguistic Analysis of 'Deaf English'. Sign Language Studies 4:7 p.139-149.

Chernov, Ghelly. 1978. Inference and Anticipation in Simultaneous Interpreting. Philadelphia, PA: John Benjamins.

Cokely Dennis. 2005. "Shifting Positionality: a Critical Examination of the Turning Point in the Relationship of Interpreters and the Deaf Community." In: Marschark, Peterson, and Winston, (eds): *Sign language Interpreting and Interpreter Education: Directions for Research and Practice*. Oxford: Oxford University Press.

Cokely, Dennis. 1992. *Interpretation: A Sociolinguistic Mode of the Interpretation Process*. Burtonsville, MD: Linstok Press

Cokely, Dennis. 2001 "Interpreting Culturally Rich Realities: Research Implications for Successful Interpretation." *Journal of Interpretation*: Millennial Edition 1-46.

Costello, Elaine. 1995 *Signing: How to Speak with Your Hands.* New York, NY: Bantam Books

Crystal, David. 1997. *The Cambridge Encyclopedia of Language*. Cambridge, UK: Cambridge University Press.

deVilliers, P. and S. Pomerantz. 1992. "English Literacy Development in Deaf Children: Directions for Research and Intervention." In J. Miller (ed.) Research on child Language Disorders: A Decade of Progress. Austin, TX: Pro-Ed.

Duranti, Alessandro.1977. *Linguistic Anthropology*. Cambridge, UK: Cambridge University Press.

Frishberg, Nancy. 1986. *Interpreting: An Introduction*. Silver Spring, MD: RID Publications.

González R.D., V.F. Vásquez and H. Mikkelson. 1991. *Fundamentals of court Interpretation: Theory, Policy and Practice*. Durham, NC: Academic Press.

Hatim, Basil and Ian Mason. 1997. *The Translator as Communicator*. New York: Routledge.

Jankowski, Katherine. 2002. *Deaf Empowerment: Emergence, Struggle, and Rhetoric*. Washington, DC: Gallaudet University Press.

Janzen, Terry (ed.). 2005. Topics in signed Language Interpreting. Philadelphia, PA: John Benjamins.

Karchmer, Michael A. and Ross E. Mitchell. 2003. "Demographic and Achievement Characteristics of Deaf and Hard-of Hearing Students." In Marschark and Spencer (eds.) *Deaf Studies, Language, and Education*. New York: Oxford University Press.

Klare, G.R. (1974). "Assessing readability." *Reading Research Quarterly*: 10(1), 62-102.

Klare, George R. "Readability." *Handbook of Reading Research*. P. David Pearson, et al. (eds.) New York: Longman, 1984. 681-744.

Klima, Edward and Ursula Bellugi 1979. *The Signs of Language*. Cambridge, MA: Harvard University Press.

Kruger, Justin and David Dunning. 1999. "Unskilled and unaware of it: How Difficulties in Recognizing One's Own Incompetence Lead to Inflated Sel-Assessments. Journal of Personality and Social Psychology. Volume 77 (6) 1121-1134

Lane, Harlan. 1984. *When the Mind Hears: A History of the Deaf*. New York: Random House.

Lane, Harlan. 1992. *Mask of Benevolence: Disabling the Deaf Community*. New York: Knopf.

Lane, Pillard and Hedberg, 2011. *The People of the Eye: Deaf Ethnicity and Ancestry*. New York, NY. Oxford University Press.

Larson, Mildred. 1998. *Meaning-Based Translation: a Guide to Cross-Cultural Equivalence*. Lanham, MD: University Press of America.

Liben, Lynn. 1978. *Deaf Children: Developmental Perspectives*. New York: Academic Press.

Lucas, Ceil. 2001. *The Sociolinguistics of the Deaf Community*. Cambridge, UK. Cambridge University Press.

Lyons, John. 1977. *Semantics*. Cambridge, UK: Cambridge University Press.

Lyons, John. 1995. *Linguistic Semantics: An Introduction*. Cambridge, UK: Cambridge University Press.

Marschark, Marc and Patricia Elizabeth Spencer (eds.). 2003. *Deaf Studies, Language, and Education*. New York: Oxford University Press.

McIntire, Marina (ed.). 1986. *Interpreting: The Art of Cross-Cultural Mediation*. Silver Spring, MD: RID Publications.

Mindess, Anna. 1999. *Reading Between the Signs: Intercultural Communication for Sign Language Interpreters*. Yarmouth, ME: Intercultural Press.

Moser-Mercer, Barbara. 1978. "Simultaneous Interpretation: A Hypothetical Model and Its Practical Application." In Gerver & Sinaiko (eds.). *Language Interpretation and Communication*. New York: Plenum Press

Padden, Carol and Tom Humphries. 1989. *Deaf in America: Voices from a Culture*. Cambridge, MA: Harvard University Press.

Padden, Carol and Tom Humphries. 2005. *Inside Deaf Culture*. Cambridge, MA: Harvard University Press.

Peterson, Rico. 1999. *The Perceptions of Deafness and Language Learning of Incoming ASL Students*. Unpublished dissertation. University of California, Riverside.

Pöchhacker, Franz. 2004. *Introducing Interpreting Studies*. London: Routledge.

Registry of Interpreters for the Deaf. 2007. Interpreting in Legal Settings

Richards, I. 1953. "Towards a Theory of translating" *American Anthropological Association, Studies in Chinese Thought 55 (Memoir 75)*: 247-262.

Robinson, Douglas. 1997. *Becoming a Translator*. New York: Routledge.

Rutherford, Susan. 1992. A Study of American Deaf Folklore. Burtonsville, MD: Linstok Press.

Seleskovitch, Danica. 1978. *Interpreting for International Conferences*. Washington, DC: Pen and Booth.

Schein, Jerome. 1996. "The Demography of Deafness" in Higgins and Nash (eds) *Understanding Deafness Socially*. Springfield, IL: Charles C. Thomas.

Spolsky, Bernard. 1989. Conditions for Second Language Learning. Oxford University Press.

Spingarn, Tracie. 2001 "Knowledge of Deaf Community-Related Words, Symbols and Acronyms among Hearing People: Implications for the Production of an Equivalent Interpretation. *Journal of Interpretation*: Millennial Edition 69-84.

Stewart, Davis, Jerome Schein and Brenda Cartwright. 1998. *Sign Language Interpreting: Exploring Its Art and Science*. Needham Heights, MA: Allyn Bacon.

Stokoe, William, Dorothy Casterline and Carl Croneberg. 1965. *A Dictionary of American Sign Language on Linguistic Principles*. Washington, DC: Gallaudet University Press.

Valli, Clayton, Ceil Lucas and Kristin Mulrooney. 2005. *Linguistics of American Sign Language*. Washington, DC: Gallaudet University Press.

Wadensjö, Cecilia. 1998. *Interpreting as Interaction*. New York. Addison Wesley Longman.

Weaver, Gary. 1997. Culture, Communication and Conflict: Readings in Intercultural Relations. Boston, MA: Pearson Publishing.

Woodward, James C. 1972. "Implications for Sociolinguistic Research among the Deaf." *Sign Language Studies* 1:1-7.

Woodward, James. 1978. "Historical Bases of American Sign Language." In P. Siple (ed) *Understanding Language Through Sign Language Research*. New York: Academic Press.

Woodward, James C. 1994. Describing Variation in American Sign Language: Implicational Lects on the Deaf Diglossic Continuum. Silver Spring, MD: Linstok Press.

Wrigley, Owen. 1996. *The Politics of Deafness*. Washington, DC: Gallaudet University Press.

Web sites cited

Arizona Department of Education, AIMS Writing Grade 4
https://www.ideal.azed.gov/p/system/files/Writing_G4_02.08.pdf

http://www.azed.gov/standards-practices/files/2011/09/grade2.pdf

Video Analysis Software
   http://www.bu.edu/asllrp/SignStream/
   http://www.sportstecinternational.com/

Registry of Interpreters for the Deaf
   http://www.rid.org

Harris Communication
   http://www.harriscomm.com/catalog/default.php?cPath=42_123

Comp Source
   http://www.compsource.com/ttechnote.asp?part_no=CLP01&vid=100&src=F

# EXHIBIT A
**Dennis Cokely c.v.**

Dennis Cokely
400 Meserve Hall
Northeastern University
Boston, MA  02115
Office:  (617) 373-3064
Fax: (617) 373-3065
Email: d.cokely@neu.edu

**Education:**

Ph.D. 1984, Georgetown University, Washington, DC.
    Major: Sociolinguistics
    Minors: Applied Linguistics & Sociolinguistics and Sign Language
    Dissertation (with distinction): Towards a Sociolinguistic Model of the Interpretation Process:
        Focus on ASL and English.
M.A. 1976, American University, Washington, DC.
    Major: Applied Linguistics
B.A.  1968, St. Mary's University, Baltimore, Maryland
    Major: Philosophy
    Minor: Classical Languages

**Professional Experience:**

Full Professor, American Sign Language Program, Northeastern University
    2007 – present
Director, American Sign Language Program, Northeastern University
    1996 – present
Chair, Department of Languages, Literatures and Cultures, Northeastern University
    1999 – present
Director, World Languages Center, Northeastern University
    2006 – present
Associate Professor, American Sign Language Program, Northeastern University
    1996 – 2007
President, Sign Media, Inc. Burtonsville, Maryland,
    1980 - 1998
Director, Sign Languages International, Newark, England
    1993 - 1998
Adjunct Professor, Madonna University, Sign Language Studies Department
    1990 - 2005
Project Director, Interpreter Education Curriculum Development Project
    University of New Brunswick, Fredericton, Canada,
    1985 - 1986
Adjunct Professor, Western Maryland College (Graduate programs: Teaching ASL Program & Teaching
    Interpretation Program), Westminster, MD
    1987 - 1993
Instructor & Assistant Professor
    Gallaudet College, Graduate School, Washington, DC.
    1976 - 1984
Research Associate, Linguistics Research Lab
    Gallaudet Research Institute, Gallaudet College Washington, DC.
    1980 - 1984
Coordinator, Pre-College Manual Communication Programs
    Pre-College Programs, Gallaudet College Washington, DC.

1977 - 1980
Sign Language Specialist, KDES Gallaudet College
1975 - 1977
Instructor, Kendall Demonstration Elementary School Gallaudet College
1971 - 1975

**Print Publications:**

**Books and Monographs:**

*Challenging Sign Language Teachers and Interpreters: The Reflector Revisited.* (ed) Burtonsville, MD: Linstok Press, 2007.

*Interpretation: A Sociolinguistic Model of the Interpretation Process*, Burtonsville, MD: Linstok Press, 1992. Significant portions have been translated and excerpted into Swedish and Japanese. The full text has also been translated into Italian and German.

*Il processo di interpretazione: un modello sociolinguistico*: Edizioni Kappa. 2002. In cooperation with the Mason Perkins Deafness Fund (Italian Translation of *Interpretation: A Sociolinguistic Model*; "This is the first book on [sign language] interpretation ever published in Italy and is an essential text for interpreter training courses").

*Gebärdensprach-Dolmetschen. Ein soziolinguistisches Modell.* (Internationale Arbeiten zur Gebärdensprache und Kommunikation Gehörloser; 28) Hamburg: Signum Verlag 1995.

*Sign Language Interpreters and Interpreting*, (ed) SLS Monograph Series, Burtonsville, MD: Linstok Press, 1992.

*New Brunswick Sign Language Interpreter Training Curriculum* (ed): University of New Brunswick. Fredericton, New Brunswick, 1988

*American Sign Language: a Teacher's Resource Text on Grammar and Culture* (with Charlotte Baker), Silver Spring, MD: T.J. Publishers, Inc., 1980; Washington, DC Gallaudet University Press, 1991.

*American Sign Language: a Teacher's Resource Text on Curriculum, Methods, and Evaluation* (with C. Baker), Silver Spring, MD: T.J. Publishers, Inc., 1980; Washington, DC Gallaudet University Press, 1991.

*American Sign Language: a Student Text units 1 - 9* (with Charlotte Baker), Silver Spring, MD: T.J. Publishers, Inc., 1980; Washington, DC Gallaudet University Press, 1991.

*American Sign Language: a Student Text units 10 - 18* (with Charlotte Baker), Silver Spring, MD: T.J. Publishers, Inc., 1980; Washington, DC Gallaudet University Press, 1991.

*American Sign Language: a Student Text units 19 - 27* (with Charlotte Baker), Silver Spring, MD: T.J. Publishers, Inc., 1981; Washington, DC Gallaudet University Press, 1991.

*Pre-College Programs: Guidelines for Manual Communication.* Washington, DC: Gallaudet College, 1979.

*Instructor's Manual for Kendall Demonstration Elementary School Family Sign Program.* Washington DC: Gallaudet College. 1973

**Book Chapters:**

The National Consortium of Interpreter Education Centers in the United States of America (with Winston). In J. Napier (ed.), *International Perspectives on Sign Language Interpreter Education*, Gallaudet University Press, 2009.

Never Our Language; Never Our Culture: the Importance of Deaf Community Connectedness for Interpreters. in Bidoli and Ochse (eds.) *English in International Deaf Communication*. Peter Lang *Linguistics Insights Series*. 2008

Shifting Positionality: a Critical Examination of the Turning Point in the Relationship of Interpreters and the Deaf Community. In: Marschark, Peterson, and Winston, (eds): *Sign language Interpreting and Interpreter Education: Directions for Research and Practice*. Oxford: Oxford University Press, 2005.

Curriculum Revision in the Twenty First Century. In Roy (ed.) *Advances in Teaching Sign Language Interpreters.* Washington, DC: Gallaudet University Press, 2005.

The Effects of Lag Time on Interpreter Errors. In Cokely (ed) *Sign Language Interpreters and Interpreting,* SLS Monograph Series, Linstok Press, 1992. (previously appeared in *Sign Language Studies* 15:53)

Assessing Student ASL Skills. In Baker-Shenk (ed) *A Model Curriculum for Teachers of American Sign Language and Teachers of ASL/English Interpretation.* Silver Spring, MD. RID Publications, 1980

Assessing Students in Interpreter Preparation Programs. In Baker-Shenk (ed) *A Model Curriculum for Teachers of American Sign Language and Teachers of ASL/English Interpretation.* Silver Spring, MD. RID Publications, 1980

Sign Language: Teaching, Interpreting, and Educational Policy. In Baker and Battison (eds) *Sign Language and the Deaf Community: Essays in Honor of William C. Stokoe.* Silver Spring, MD: National Association of the Deaf, 1980.

Sign language in the 20th century: a Chronology. In: Baker and Battison (eds): *Sign Language and the Deaf Community. Essays in Honor of William C. Stokoe.* Silver Spring: NAD, 1980.

Childrenese as Pidgin. (with R. Gawlik) In: Stokoe, William C. (ed): *Sign and Culture. A Reader for Students of American Sign Language.* Silver Spring, MD : Linstok Press, 1980. (previously published in *Sign Language Studies* 5, 1974)

**Refereed Articles:**

Interpreting in Teams: A Pilot Study on Requesting and Offering Support. (with J. Hawkins) *Journal of Interpretation*, Fall 2003.

Interpreting Culturally Rich Realities. *Journal of Interpretation,* Fall 2001.

Exploring Ethics: A Case for Revising the Code of Ethics. *Journal of Interpretation,* Fall 2000.

The Effectiveness of Three Means of Communication in the College Classroom. *Sign Language Studies*, 69, Winter, 1990. Translated into German (*Die Relative Effektivität Unterschiedlicher Kommunikationsmittel im College-Unterricht.* In: Das Zeichen 5: 17 (1991))

Sociolinguistics, Language Policy and Education. in: J. Van Cleve (ed): *Gallaudet Encyclopedia of Deaf People and Deafness.* Vol. 3. S-Z, Index. New York, NY: McGraw-Hill Book Company, Inc., 1987.

The Effects of Lag Time on Interpreter Errors. *Sign Language Studies* 15, Fall, 1986

Foreigner's Talk and Learner's Grammar. *The Reflector,* 1984.

Comment on Newell et al. *Sign Language Studies* 12: 41, 1983.

When is a Pidgin not a Pidgin? An Alternate Analysis of the ASL-English Contact Situation. *Sign Language Studies*, 38, Spring, 1983.

Metanotative Qualities: How Accurately are They Conveyed by Interpreters? *The Reflector*, 5, Winter, 1983.

The Interpreted Medical Interview: It Loses Something in the Translation. *The Reflector*, 1982.

Sign Language Interpreters: A Demographic Survey. *Sign Language Studies*, 10, Fall, 1981.

Assessing Communication Skills. *Directions*, 1, No. 4, 1980.

Options II: Childrenese as Pidgin. (with R. Gawlik) *Sign Language Studies* 5 1974. (expanded version of an earlier piece in *The Deaf American*).

**Non-Refereed Articles:**

A response to "The Danger Within…" CIT News, July 2006

How it's (not) done! In: *Sign Language Studies 23:* 84, 1994.

Editor's Comments: Tri-cultural Awareness. *The Reflector*, 1984.

Editor's Comments: Cultures of Deaf People. *The Reflector*, 1983.

Editor's Comments: Functional Competence. *The Reflector*, 1983.

Editor's Comments: Fluency in ASL. *The Reflector*, 1983.

Editor's Comments: Style Levels. *The Reflector*, 1983.

Editor's Comments: Signs for Special Purposes. *The Reflector*, 1982

College Level Sign Language Programs: a Resource List. *The Reflector* 1981.

Editor's Comments: Terminology. *The Reflector,* 1981.

Editor's Comments: Assessing Interpretation. *The Reflector*, 1981.

Options II: Childrenese as Pidgin. (with R. Gawlik) In: *The Deaf American* 26, 1974

Options: A position paper of the relationship between Manual English and Sign. (with R. Gawlik) In: *The Deaf American* 25, 1973.

**National Consortium of Interpreter Education Centers grant-funded publications:**

Interpreter Practitioner Needs Assessment Trends Analysis Final Report (with E. Winston), May 2010

Recent Findings: Stakeholder Trends, May 2010

Recent Findings: Trends Across All Needs Assessments, May 2010

Interpreter Education Programs Assessment Trends Analysis Final Report (with E. Winston), March 2010

Vocational Rehabilitation Needs Assessment Final Report (with E. Winston), November 2009

Phase II Deaf Consumer Needs Assessment Final Report (with E. Winston), September 2009

Interpreter Referral Agency Needs Assessment Final Report (with E. Winston), October 2008

Phase I Deaf Consumer Needs Assessment, Final Report (with E. Winston), September 2008

Interpreter Education Programs Needs Assessment, Final Report (with E. Winston), July 2008

NCIEC Interpreter Practitioner Needs Assessment, Final Report (with E. Winston), September 2007

**Conference Proceedings:**

Multimedia Dictionary of American Sign Language (Wilcox, Scheibman, Wood, Cokely, and Stokoe co-authors) in *Proceedings of the first annual ACM Conference on Assistive Technologies*. New York, NY ACM Press, 1994.

A Diagnostic Approach to Assessing American Sign Language. In: Caccamise, Garretson, and Bellugi (eds): *Teaching American Sign Language as a Second Language. Proceedings of the Third National Symposium on Sign Language Research and Teaching.* Boston, MA October 26-30, 1980. Silver Spring : NAD, 1982.

Meeting the Communication Needs of Deaf Students and Their Families. In: Bulgarian Deaf Union (ed): *The Deaf People in Modern Society. Proceedings of the 8th World Congress of the World Federation of the Deaf.* Varna, 1981.

Videotape Techniques in Sign Language Teaching. In Stokoe (Ed.) *Proceedings of the 1977 National Symposium on Sign Language Research and Teaching.* Silver Spring, MD: National Association of the Deaf, 1980.

Program Considerations in a Bilingual ASL-English Approach to Education. In Caccamise and Hicks (Eds.) *Proceedings of the 1978 National Symposium on Sign Language Research and Teaching*. Silver Spring, MD: National Association of the Deaf, 1980.

Evaluating ASL Skills in Pre-College Programs. (with David Knight) In Caccamise and Hicks (Eds.) *Proceedings of the 1978 National Symposium on Sign Language Research and Teaching.* Silver Spring, MD: National Association of the Deaf, 1980.

Curriculum and Instruction: Evaluation. In Caccamise and Gustason (Eds.) *Manual/Simultaneous Communication Instructional Programs in the Educational Setting*. Washington, DC: Gallaudet College Press, 1979.

An Innovative Approach to Family Sign Language Instruction. In: *Proceedings of the Forty-Seventh Convention of American Instructors of the Deaf,* 1975.

## Video Publications:
### Program Creation, Development, Direction, and Post-Production:

For each of the following 130 programs or program segments, responsibilities included: program background research, program preparation, program content and format, script writing and sequencing, talent selection and direction, program continuity control, log camera master videos, prepare edit decision list, supervise on-line edit, approve final edit, and supervise voice-over session.

| Program Title | Number of Tapes | Year Published |
|---|---|---|
| *Interpreter Practice Materials* | 33 | 1996 |
| *Edgar Allan Poe* | 3 | 1996 |
| *Sherlock Holmes* | 3 | 1996 |
| *High-Five! Fables and Fairy Tales* | 5 | 1994 |
| *When the Mind Hears* | 13 | 1993 |
| *Using Your TTY* | 1 | 1993 |
| *An Introduction to the Deaf Community* | 1 | 1992 |
| *Interpreting the Miranda Warnings* | 1 | 1992 |
| *ASL Across America* | 12 | 1992 |
| *Semantic Awareness Test Kit* | 7 | 1991 |
| *Fingerspelling Practice Tapes* | 4 | 1991 |
| *Sports Sign Series* | 4 | 1991 |
| *Sign Language Interpreters in the Public Schools* | 3 | 1990 |
| *Signs Around the World* | 9 | 1990 |
| *Colors Around the World* | 1 | 1990 |
| *Selected Signs Around the World* | 1 | 1990 |
| *Alphabets Around the World* | 1 | 1990 |
| *Four For You! Fables and Fairy Tales* | 5 | 1989 |
| *Interpreters on Interpreting* | 6 | 1989 |
| *ABC Stories* | 1 | 1988 |
| *The Parent Sign Series* | 10 | 1985 |
| *Interpreter Models Series* | 2 | 1985 |
| *American Sign Language videotapes* | 6 | 1980 |

### Direction, and Post-Production:

For each of the following 51 programs or program segments, responsibilities included: program format, talent selection and direction, continuity control, and approve final edit.

| Program Title | Number of Tapes | Year Published |
|---|---|---|
| *American Freedom Speeches* | 2 | 1995 |
| *Interpreting in the American Legal System* | 12 | 1995 |
| *The Gospel of Luke: An ASL Translation* | 5 | 1995 |
| *Live at SMI !!* | 7 | 1993 |
| *Working With a Sign Language Interpreter* | 1 | 1993 |
| *Deaf-Blind Communication & Community* | 2 | 1992 |
| *The Face of ASL* | 4 | 1991 |
| *To Your Health* | 2 | 1991 |
| *Poetry in Motion* | 3 | 1990 |
| *ASL Numbers: Developing Your Skills* | 3 | 1989 |

| | | |
|---|---|---|
| *Overuse Syndrome* | 1 | 1989 |
| *The American Sign Language Phrase Book* | 3 | 1988 |
| *The Mystery of the Superintendent's House* | 1 | 1986 |
| *Introduction to American Deaf Culture* | 5 | 1985 |

**Published ASL-English Translations:**

Each of the following English translations was prepared for published videotapes. These translations of American Sign Language were used as scripts in the production of spoken translations that comprise the accompanying audio track. These translations are also available in printed form upon request. I am the sole translator of these materials.

| | |
|---|---|
| *Gilbert Eastman: Live at SMI* | *Four For You: Fables and Fairy Tales, volume 1* |
| *Patrick Graybill: Live at SMI* | *Four For You: Fables and Fairy Tales, volume 2* |
| *Eric Malzkuhn: Live at SMI* | *Four For You: Fables and Fairy Tales, volume 3* |
| *When the Mind Hears: My New Family* | *Four For You: Fables and Fairy Tales, volume 4* |
| *When the Mind Hears: Shepherd and Symbol* | *Four For You: Fables and Fairy Tales, volume 5* |
| *When the Mind Hears: High Theater* | *Sports Sign Series: Basketball* |
| *When the Mind Hears: A Tale Based on Fact* | *Sports Sign Series: Baseball* |
| *When the Mind Hears: The Secret* | *Sports Sign Series: Volleyball* |
| *When the Mind Hears: Success and Failure* | *Sports Sign Series: Soccer* |
| *When the Mind Hears: Fortune and Misfortune* | *High Five! Fables and Fairy Tales, volume 1* |
| *When the Mind Hears: Spreading the Word* | *High Five! Fables and Fairy Tales, volume 2* |
| *When the Mind Hears: Concerning Women* | *High Five! Fables and Fairy Tales, volume 3* |
| *When the Mind Hears: A Dangerous Incursion* | *High Five! Fables and Fairy Tales, volume 4* |
| *When the Mind Hears: The Denial* | *High Five! Fables and Fairy Tales, volume 5* |
| *When the Mind Hears:  The Incurable Deafness* | *Sherlock Holmes: Red-Headed League* |
| *Edgar Allen Poe: The Black Cat* | *Sherlock Holmes: The Blue Carbuncle* |
| *Edgar Allen Poe: Fall of the House of Usher* | *Sherlock Holmes: The Speckled Band* |
| *Edgar Allen Poe: The Pit and the Pendulum* | *The Preservation of Sign Language* |

**Published English-ASL Translations:**

Each of the following American Sign Language translations was prepared for *American Freedom Speeches*, a videotape/text instructional package published in 1994. These ASL translations of English texts were used in the production of the videotape portion of this package. Co-translated with Patrick Graybill.

*The Preamble to the Constitution*
*The Bill of Rights*
*Liberty or Death*, by Patrick Henry
*Inaugural Address,* by Thomas Jefferson
*Gettysburg Address*, by Abraham Lincoln
*On Woman's Suffrage*, by Susan B. Anthony
*Inaugural Address*, by Franklin D. Roosevelt
*Inaugural Address*, by John F. Kennedy
*I Have A Dream*, by Martin Luther King, Jr.
*Struggle for Justice*, by Cesar Chavez
*On Human Rights*, Jimmy Carter
*Vice-Presidential Acceptance Speech*, by Geraldine Ferraro

**Web Published articles::**

The following articles have been posted to the site *Streetleverage: Amplifying the Voice of the sign Language Interpreter*.
Sign Language Interpreters — Complicit in a Devil's Bargain?  http://www.streetleverage.com/?p=1164
Vanquished Voices — a Sign Language Interpreting Crisis? http://www.streetleverage.com/?p=1605

**Grants:**

    **Successful External Grants:**

        Co-Principal Investigator, Northeastern University National Interpreter Education Center, Department of Education, 2011-2015 (grant award - $3,000,000)

        Key Personnel, Northeastern University Regional Interpreter Education Center, Department of Education, 2011-2015 (grant award - $1,500,000)

        Co-Principal Investigator, Northeastern University National Interpreter Education Center, Department of Education, 2005-2010 (grant award - $3,000,000)

        Key Personnel, Northeastern University Regional Interpreter Education Center, Department of Education, 2005-2010 (grant award - $1,500,000)

        Co-Principal Investigator, Teaching Interpreter Educators and Mentors Online, Department of Education, 2002-2005 (grant award - $700,000)

        Key Personnel, Northeastern Interpreter Education Project, Department of Education, 2000-2005 (grant award – $675,000)

        Key Personnel and Grant Administrator, NIH SBIR grant-funded *ASL CD-ROM Dictionary* Project 1988-1993 (grant award – $750,0000)


    **Successful Internal Grants:**

        Instructional Development Fund grant, 2008, Northeastern's Provost's office (award - $7,660)

        Teaching With Technology grant, 2002, Northeastern's Provost's office (award - $25,000)

**Selected Related Experience:**

        President, Registry of Interpreters for the Deaf, 1983 - 1987

        Member, Board of Directors, Registry of Interpreters for the Deaf 1978- 1980

        Associate Editor, *Sign Language Studies* 1984-1996

        English Editor NIH SBIR grant-funded *ASL CD-ROM Dictionary* Project 1988-1993

        Editor, *The Reflector, A Journal for Sign Language Teachers and Interpreters* 1981- 1985.

        Coordinator of Interpreters for National and International Conferences

            Selected experiences: Coordinated Conferences include the NATO International Conference on Sign Language Research (Copenhagen, Denmark), Georgetown University Round Table on Languages and Linguistics (annually 1978 – 1985) the Third National Symposium on Sign Language Research and Teaching (Boston).

        Evaluation/Certification Team Chair, Sign Instructors Guidance Network (S.I.G.N.), 1976 – 1986.

        Professional Interpreter, 1971 – present

**Selected Certification:**

        Comprehensive Skills Certificate (CSC), Registry of Interpreters for the Deaf

        Comprehensive Permanent Certification, American Sign Language Teachers Association (ASLTA/SIGN)

        Teaching English as a Second/Foreign Language, American University

        Lifetime Post-Secondary Teaching Certificate, state of California

**Selected Awards and Honors:**

        2006 Northeastern University Nominee for the CASE Professor of the Year Award (Council for Advancement and Support of Education)

        2005 Outstanding Interpreter Educator Award

            Massachusetts Registry of Interpreters for the Deaf

2002 Excellence in Teaching Award
    Northeastern University

2002 Northeastern University Nominee for the Robert Foster Cherry Award for Great Teaching
    Baylor University

2000 Advisor of the Year Award
    College of Arts and Sciences, Northeastern University

1993 President's Award of Excellence, Madonna University
    "for excellence in promoting the language and culture of the Deaf Community"

1987 The Mary Stotler Professional Development Award
    by Registry of Interpreters for the Deaf and the Conference of Interpreter Trainers

1983 The Virginia Hughes Award
    by the Sign Language Interpreters of California
        "for Outstanding Contributions to the Interpreting Profession"


**Expert Witness Reports and/or Testimony:**

On behalf of David Bryant, 2011
    Bryant v Federal Bureau of Prisons
    Sullivan & Cromwell LLP, Attorneys
    Washington Lawyers' Committee for Civil Rights and Urban Affairs

On behalf of Minnis, et al, 2010
    Minis, et al v Virginia Department of Corrections
    Winston & Strawn, LLP, Attorneys
    Washington Lawyers' Committee for Civil Rights and Urban Affairs

On behalf of Deborah Gibson, 2008
    NIR v Deborah Gibson
    William Pincus, Attorney

On behalf of Jeffery Beardsley and Colette Ward, 2006
    Beardsley and Ward v City of North Las Vegas
    Marina Kolias and Dale Boam, Attorneys

On behalf of Hubbard et. al. 2006 - 2009
    Hubbard et al v United States Postal Service
    Covington & Burling, Attorneys
    Washington Lawyers' Committee for Civil Rights and Urban Affairs

On behalf of Stockdale et. al. 1999 - 2000
    Stockdale et al v Dorsey Business School
    Jeff Kojacar, Attorney

On behalf of the DeCosta family 1998 - 1999
    DeCosta family v Beth Israel/Deaconess hospital
    Lin Beck, Attorney

On behalf of the US Department of Justice and the state of Maine 1997 - 1999
    Janet DeVinney v Maine Medical Center
    James Moore, US Department of Justice, Attorney

On behalf of John Doe, 1992 - 1993

John Doe v state of South Carolina
John Claybrooke, Attorney

On behalf of Carl Dupree, 1991 - 1992
Family of Carl Dupree v Gallaudet University
Sarah Blackridge, Attorney

**Seminar, and Workshop Presentations:**

Several hundred invited international and domestic seminars, lectures and workshop presentations on a wide range of topics, including:

Theoretical Models of Interpretation, Theoretical Aspects of Interpretation, Interpretation, Evaluation and Testing, Diagnostic Assessment of Interpretation, Proficiency Assessment of Interpretation, Educational Preparation of Interpreters, Comparative Linguistics for Interpreters, Semantics of American Sign Language, Teaching American Sign Language, Sign Language Assessment and Evaluation, Bilingual Education, Developing Communication Policy, Linguistics of American Sign Language, Communication and Communication Systems, Language Development, Language Acquisition, Cross-Cultural Interaction, Culture and Language

Selected domestic institutions at which invited graduate and undergraduate seminars and workshops have been offered during the past fifteen years include:

University of Hawaii, California State University at Northridge, Community College of Philadelphia, Central Piedmont Community College, DeKalb Community College, Gallaudet University, Georgetown University, Johnson County Community College, LaGuardia Community College, Madonna University, National Technical Institute for the Deaf, New York University, Ohlone College, Rutgers University, Seattle Central Community College, Syracuse University, Towson State University, University of Alabama, University of California at Berkeley, University of California at San Diego, University of Delaware, University of Maryland, University of New Hampshire, University of New Mexico, University of Pennsylvania, University of Tennessee, Vista College, Western Maryland College, William Woods University.

Selected international institutions at which invited seminars and workshops have been offered during the past fifteen years include:

University of Perugia, (Italy), American University of Rome (Italy), University of Copenhagen (Denmark), Tokyo Christian University (Japan), Durham University (Great Britain), University of New Brunswick (Canada), University of Ottawa (Canada), Stockholm University (Sweden), Wolverhampton University (Great Britain), Central Lancershire University (Great Britain), McGill University (Canada), Herriot-Watt University (Scotland).

**Recent Selected Invited International Conference Presentations:**

IDP-DC Community Forum Panel: What's Our IQ (Impact Quotient)? Part II. 2009 Conference of the Registry of Interpreters for the Deaf.

National Consortium of Interpreter Education Centers: Needs Assessment Activity Report (with Betsy Winston). 2007 Conference of the Registry of Interpreters for the Deaf.

Discover Interpreting! Marketing Interpreting as a Career (with Cathy Cogen). 2007 Conference of the Registry of Interpreters for the Deaf.

IDP-DC Community Forum Panel: What's Our IQ (Impact Quotient)? Part I. 2007 Conference of the Registry of Interpreters for the Deaf.

Research Implications for Interpreting in Teams. Italian Interpreters Association, American University of Rome, January 2003.

Diagnostic Assessment of Sign Language Skills. Italian Sign Language Teachers Association Conference, Rome, January 2003.

A Rights-Based Approach to Ethics for Sign Language Interpreters. Keynote Address at the first International Supporting Deaf People Online Conference, Derbyshire, Great Britain, January 2001.

Culturally Rich Realities: Challenges for Interpreters. Keynote address, International Symposium on Sign Language Interpretation, Durham University, October 1998.

ASL: Syntactic Structure. Pan-Asian International Sign Language Symposium, Tokyo Christian University, April 1994.

Diagnostic Assessment of Interpretation, Swedish Conference on Interpretation, August 1993.

**Selected Recent Invited National and Regional Conference Presentations:**

Portfolios: A Place in Assessing Interpreter Competencies presented to the Legal Interpreters Member Section at the Registry of Interpreters for the Deaf Conference, Atlanta, 2011

What's in Your Knapsack? Endnote presentation at the RID Region I Conference August 15, 2010.

Cars, Dogs and Cows: Getting Inside the Interpreter's Mind. Workshop presented to the Vermont Registry of Interpreters for the Deaf. May 16, 2009.

Ignoring our Past, Dooming Our Future? Workshop presented to the interpreting community of Hudson Valley, Newburgh, NY, April 26, 2009.

Culturally Rich Realities: Implications for Interpreters. Conferencia PRRID (Puerto Rico Registry of Interpreters for the Deaf Conference), August 4-5, 2006.

Curriculum Revision for Interpreter Education Programs. Conference of Interpreter Trainers, Gallaudet University, October 2004.

Exploring Ethical Decision-Making for Interpreters. Pennsylvania State Registry of Interpreters for the Deaf, Philadelphia, Pennsylvania, October 2002.

Portfolios and Mentoring. Nashua, New Hampshire. New England Mentorship Conference for Working Interpreters, September 2001.

A Systematic Approach to Diagnostic Assessment of Interpretation. Registry of Interpreters for the Deaf conference, Orlando Florida, August 2001.

Reflections on The Linguistics Research Lab. The Study of Signed Languages: A Conference in Honor of William Stokoe, Gallaudet University, October 1999.

Interpreting Culturally Rich Realities: Research Implications for Successful Interpretations. Registry of Interpreters for the Deaf, Boston, Massachusetts, July 1999.

**Northeastern University Teaching History 1996 – 2009**

| Year | Term | Course | Title | Enrollment |
|------|------|--------|-------|------------|
| 1996-97 | Fall | ASL 1520 | Interpreting Role & Ethics | 11 |
| | Winter | ASL 1250 | Linguistics of ASL | 8 |
| | Spring | ASL 1507 | ASL-English Interpreting 3 | 11 |
| | | ASL 1801 | Directed Study | 3 |
| 1997-98 | Fall | ASL 1211 | Deaf Culture | 7 |
| | | ASL 1520 | Interpreter Role & Ethics | 8 |
| | Winter | ASL 1212 | Deaf History | 14 |
| | | ASL 1250 | Linguistics of ASL | 18 |
| 1998-99 | Fall | ASL 1220 | Deaf People in Society* | 76 |
| | | ASL 1505 | ASL-English Interpreting 1 | 15 |
| | | ASL 1520 | Interpreter Role & Ethics | 13 |
| | Winter | ASL 1801 | Directed Study | 4 |
| | | ASL 1810 | Special Topics in Interpreting* | 5 |
| | Spring | ASL 1220 | Deaf People in Society | 50 |

| | | | | |
|---|---|---|---|---|
| | | ASL 1250 | Linguistics of ASL | 19 |
| | | ASL 1801 | Directed Study | 4 |
| 1999-00 | Fall | ASL 1001 | College Intro | 5 |
| | | ASL 1220 | Deaf People in Society | 70 |
| | | ASL 1505 | ASL-English Interpreting 1 | 12 |
| | | ASL 1508 | ASL-English Interpreting 4 | 12 |
| | | ASL 1520 | Interpreter Role and Ethics | 12 |
| | | ASL 1801 | Directed Study | 1 |
| | Winter | ASL 1801 | Directed Study | 3 |
| | Spring | ASL 1211 | Deaf History | 21 |
| | | ASL 1220 | Deaf People in Society | 67 |
| | | ASL 1801 | Directed Study | 2 |
| 2000-01 | Fall | ASL 1220 | Deaf People in Society | 76 |
| | | ASL 1505 | ASL-Eng Interpreting 1 | 13 |
| | | ASL 1520 | Interpreter Role & Ethics | 8 |
| | | ASL 1801 | Directed Study | 4 |
| | Winter | ASL 1212 | Deaf Culture | 27 |
| | | ASL 1801 | Directed Study | 3 |
| | | ASL 1810 | Practicum | 8 |
| | | ASL 1801 | Directed Study | 3 |
| | Spring | ASL 1211 | Deaf History | 11 |
| | | ASL 1801 | Directed Study | 2 |
| 2001-02 | Fall | ASL 1220 | Deaf People in Society | 79 |
| | | ASL 1505 | ASL-Eng Interpreting 1 | 11 |
| | | ASL 1520 | Interpreter Role & Ethics | 14 |
| | | ASL 1802 | Directed Study | 2 |
| | Winter | ASL 1212 | Deaf Culture | 30 |
| | | ASL 1801 | Directed Study | 1 |
| | Spring | ASL 1211 | Deaf History | 28 |
| | | ASL 1220 | Deaf People in Society | 78 |
| | | ASL 1801 | Directed Study | 2 |
| 2002-03 | Fall | ASL 1220 | Deaf People in Society | 73 |
| | | ASL 1505 | ASL-Eng Interpreting 1 | 13 |
| | | ASL 1520 | Interpreter Role & Ethics | 9 |
| | | ASL 1801 | Directed Study | 3 |
| | Winter | ASL 1212 | Deaf Culture | 30 |
| | | ASL 1801 | Directed Study | 1 |
| | Spring | ASL 1211 | Deaf History | 28 |
| | | ASL 1220 | Deaf People in Society | 78 |
| | | ASL 1801 | Directed Study | 3 |
| 2003-04 | Fall | ASL 150 | Deaf People in Society | 80 |
| | | ASL 350 | Deaf History & Culture | 24 |
| | | ASL 510 | Interpreting Inquiry Texts* | 14 |
| | | ASL 650 | Ethical Decision-Making* | 10 |
| | | ASL 924 | Directed Study | 3 |
| | Spring | ASL 950 | Interpreting Practicum | 9 |
| | | ASL 924 | Directed Study | 9 |
| 2005-06 | Fall | ASL 150 | Deaf People in Society | 71 |
| | | ASL 100 | Introduction to College | 9 |
| | | ASL 510 | Interpreting Inquiry Texts | 3 |
| | | ASL 650 | Ethical Decision-Making | 15 |
| | | ASL 651 | Ethical Fieldwork | 15 |
| | Spring | ASL 950 | Interpreting Practicum | 14 |
| | | ASL 460 | ASL Linguistics | 19 |
| | | ASL 934 | Directed Study | 2 |
| 2006-07 | Fall | ASL 150 | Deaf People in Society | 69 |
| | | ASL 100 | Introduction to College | 6 |
| | | ASL 510 | Interpreting Inquiry Texts | 8 |
| | | ASL 650 | Ethical Decision-Making | 3 |
| | | ASL 651 | Ethical Fieldwork | 3 |

|         |        | ASL 960   | Research Capstone               | 7  |
|---------|--------|-----------|---------------------------------|----|
|         | Spring | ASL 950   | Interpreting Practicum          | 3  |
|         |        | ASL 934   | Directed Study                  | 5  |
| 2007-08 | Fall   | ASL 150   | Deaf People in Society          | 61 |
|         |        | ASL 100   | Introduction to College         | 5  |
|         |        | ASL 650   | Ethical Decision-Making         | 14 |
|         |        | ASL 651   | Ethical Fieldwork               | 14 |
|         |        | ASL 960   | Research Capstone               | 16 |
|         | Spring | ASL 950   | Interpreting Practicum          | 13 |
|         |        | ASL 934   | Directed Study                  | 5  |
| 2008-09 | Fall   | ASL 150   | Deaf People in Society          | 55 |
|         |        | ASL 100   | Introduction to College         | 5  |
|         |        | ASL 650   | Ethical Decision-Making         | 14 |
|         |        | ASL 651   | Ethical Fieldwork               | 14 |
|         |        | ASL 550   | Intro to Interpreting Profession| 15 |
|         |        | ASL 960   | Research Capstone               | 18 |
|         | Spring | ASL 950   | Interpreting Practicum          | 13 |
|         |        | ASL 934   | Directed Study                  | 4  |
| 2009-10 | Fall   | DEAF 1500 | Deaf People in Society          | 45 |
|         |        | DEAF 2500 | Deaf History & Culture          | 12 |
|         |        | INTP 4650 | Ethical Decision-Making         | 12 |
|         |        | INTP 4651 | Ethical Fieldwork               | 12 |
|         |        | INTP 3500 | Intro to Interpreting Profession| 12 |
|         |        | INTP 4940 | Research Capstone               | 7  |
|         | Spring | INTP 4995 | Interpreting Practicum          | 11 |
|         |        | INTP 3550 | Research Capstone               | 4  |
|         |        | DEAF 4992 | Directed Study                  | 3  |
| 2010-11 | Fall   | DEAF 1500 | Deaf People in Society          | 48 |
|         |        | DEAF 2500 | Deaf History & Culture          | 16 |
|         |        | INTP 4650 | Ethical Decision-Making         | 8  |
|         |        | INTP 4651 | Ethical Fieldwork               | 8  |
|         |        | INTP 3500 | Intro to Interpreting Profession| 8  |
|         |        | INTP 4940 | Research Capstone               | 4  |
|         | Spring | ASL 950   | Interpreting Practicum          | 11 |
|         |        | ASL 460   | Research Capstone               | 7  |
|         |        | ASL 934   | Directed Study                  | 4  |
| 20011-12| Fall   | DEAF 1500 | Deaf People in Society          | 49 |
|         |        | DEAF 2500 | Deaf History & Culture          | 12 |
|         |        | INTP 4650 | Ethical Decision-Making         | 10 |
|         |        | INTP 4651 | Ethical Fieldwork               | 10 |
|         |        | INTP 3500 | Intro to Interpreting Profession| 8  |
|         |        | INTP 4940 | Research Capstone               | 3  |
|         | Spring | INTP 4995 | Interpreting Practicum          | 10 |
|         |        | INTP 3550 | Research Capstone               | 7  |
|         |        | DEAF 4992 | Directed Study                  | 3  |

* Note: These courses were developed and taught for the first time. *Deaf People in Society* is also approved as satisfying the College of Arts and Sciences Diversity requirement.

**Service:**

      University:

            Faculty Senate, 2012 – 2015

            Chair, Faculty Handbook Revision Committee, 2010

            Chair, College of Social Sciences and Humanities Re-Structuring Task Force, 2009

            Chair, Council of Chairs Agenda Committee

Member, International Programs Advisory Committee

Chair, Ad Hoc Committee to review University Tenure Appeals, 2008

Chair, Faculty Development Committee, 2008

Director, World Languages Center, 2007 - present

Faculty Senate, 2005 – 2008

Committee on Community Harmony and Inclusion, 2007 - present

RSFD proposal review committee, 2006

University Retention Committee, 2003-06

Chair, Senate Enrollment and Admissions Policy Committee, 2003-04

Member, University Retention Committee, 2000-03

Faculty Advisor for ICNU (the Interpreting Club of Northeastern University)

Faculty Advisor for NUCALLS (Northeastern University Culture and Language Learning Society)

College:

College of Arts and Sciences Council of Chairs Agenda Committee Chair, 2000-2010

College of Arts and Sciences Tenure and Promotion Committee Chair, 1999 - 2006

College Tenure and Promotion Committee member, 1998 -1999


Program:

Head Advisor, American Sign Language Program, 1996 – present

Experiential Education Advisor American Sign Language Program, 1996 – present

Community:

Interpret for DEAF, Inc. Board meetings, *pro bono*, 2005 - present

Interpret weekly FAA AWOL meetings, *pro bono*, 2004 - 2006

Advisory Board member, PAH! Deaf Youth Theater, 1998 - 2001

Advisory Board member, Madonna University Sign Language Studies, 1983 – present

Administer annual ASL Festival, April 1997 – present

Administer annual ASL Poetry, Storytelling & Deaf Art Competition, April 1998 - present

Discipline

Reviewer for NSF -- dissertation and grants proposals

Various Interpreter Education program structure and faculty reviews

Various Interpreter Education program curriculum reviews

Review of manuscripts

Review of tenure dossiers


**Membership in Professional Organizations:**

Registry of Interpreters for the Deaf (Lifetime Member)

Conference of Interpreter Trainers

Linguistics Society of America

American Council on the Teaching of Foreign Languages

 American Association of Applied Linguistics

Research Committee for Sociolinguistics

American Translators Association

# EXHIBIT B
**Materials provided**

2012_08_14 - Complaint DMEAST_15525821(1)

2012_08_14 - Motion for Temporary Restraining Order, Memo and Proposed Order DMEAST_15525828(1)

2012_09_04 - Defendants_ Opposition to Plaintiff_s Motion for TRO DMEAST_15610189(1).pdf

Craig Declaration DMEAST_15625106(1)